# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 24-1054, -1059, -1101, -1103, -1111, -1114,
-1115, -1116, -1117

STATE OF TEXAS, *et al.*,
*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY *and* MICHAEL S. REGAN,
*Administrator, United States Environmental Protection Agency*,
*Respondents.*

On Petition For Review Of Final Agency Action By The
United States Environmental Protection Agency
89 Fed. Reg. 16,820 (Mar. 8, 2024)

## OPENING BRIEF OF STATE PETITIONERS

GENTNER DRUMMOND
*Attorney General*

GARRY M. GASKINS, II
*Solicitor General*

JENNIFER L. LEWIS
*Deputy Attorney General*
OFFICE OF THE ATTORNEY
GENERAL OF OKLAHOMA
313 NE Twenty-First St.
Oklahoma City, OK 73105
(908) 938-3712
garry.gaskins@aog.ok.gov
jennifer.lewis@aog.ok.gov

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
KAITLIN L. O'DONNELL
EMILY A. O'BRIEN
DYLAN DEWITT
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

*Counsel for the State of Oklahoma*
*(Additional counsel listed on following pages)*

CARROLL WADE MCGUFFEY III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Ste. 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

JEFF P. JOHNSON
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point, Ste. 1500
Richmond, VA 23219
(804) 697-1480
jeff.johnson@troutman.com

*Counsel for the State of Oklahoma*

STEVE MARSHALL
*Attorney General*
EDMUND G. LACOUR JR.
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
Edmund.LaCour@
AlabamaAG.gov

*Counsel for the State of Alabama*

TREG TAYLOR
*Attorney General*
GARRISON TODD
*Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5539
Garrison.todd@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
*Attorney General*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN JACOBS
*Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for the State of
Arkansas*

ASHLEY MOODY
*Attorney General*

HENRY C. WHITAKER
*Solicitor General*

JAMES H. PERCIVAL
*Chief of Staff*
OFFICE OF THE ATTORNEY GENERAL
OF FLORIDA
The Capitol, Pl-01
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
*Attorney General*

STEPHEN J. PETRANY
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF GEORGIA
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

RAÚL R. LABRADOR
*Attorney General*

ALAN M. HURST
*Solicitor General*
OFFICE OF THE IDAHO ATTORNEY
GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 947-8773
alan.hurst@ag.idaho.gov

*Counsel for the State of Idaho*

THEODORE E. ROKITA
*Attorney General*

JAMES A. BARTA
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF INDIANA
302 W. WASHINGTON ST.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

BRENNA BIRD
*Attorney General*

ERIC H. WESSAN
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF IOWA
1305 E. Walnut Street
Des Moines, IA 50319
(515) 823-9117
eric.wessan@ag.iowa.gov


*Counsel for the State of Iowa*


KRIS KOBACH
*Attorney General*

ANTHONY J. POWELL
*Solicitor General*
KANSAS ATTORNEY GENERAL'S
OFFICE
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 368-8539
anthony.powell@ag.ks.gov


*Counsel for the State of Kansas*

RUSSELL COLEMAN
*Attorney General*

MATTHEW F. KUHN
*Solicitor General*
OFFICE OF THE KENTUCKY
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5447
matt.kuhn@ky.gov


*Counsel for the Commonwealth
of Kentucky*


LIZ MURRILL
*Attorney General*

J. BENJAMIN AGUIÑAGA
*Solicitor General*
LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 506-3746
aguinagaj@ag.louisiana.gov


*Counsel for the State of
Louisiana*

LYNN FITCH
*Attorney General*

JUSTIN L. MATHENY
*Deputy Solicitor General*
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
601-359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


ANDREW BAILEY
*Attorney General*

JOSHUA M. DIVINE
*Solicitor General*

SAMUEL C. FREEDLUND
*Deputy Solicitor General*
MISSOURI ATTORNEY GENERAL'S
OFFICE
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
josh.divine@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
*Attorney General*

CHRISTIAN B. CORRIGAN
*Solicitor General*
MONTANA DEPARTMENT OF
JUSTICE
215 North Sanders P.O. Box
201401 Helena, MT 59620
(406) 444-2707
christian.corrigan@mt.gov

*Counsel for the State of Montana*


MICHAEL T. HILGERS
*Attorney General*

ERIC J. HAMILTON
*Solicitor General*

GRANT STROBL
*Assistant Solicitor General*
NEBRASKA DEPARTMENT OF
JUSTICE
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.strobl@nebraska.gov

*Counsel for the State of Nebraska*

DREW H. WRIGLEY
*Attorney General*

PHILIP AXT
*Solicitor General*
OFFICE OF ATTORNEY GENERAL OF
NORTH DAKOTA
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

ALAN WILSON
*Attorney General*

ROBERT D. COOK
*Solicitor General*

J. EMORY SMITH, JR.
*Deputy Solicitor General*

JOSEPH D. SPATE
*Assistant Deputy Solicitor
General*
OFFICE OF THE ATTORNEY
GENERAL OF SOUTH CAROLINA
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South
Carolina*

DAVID YOST
*Attorney General*

T. ELLIOT GAISER
*Solicitor General*

MATHURA J. SRIDHARAN
*Deputy Solicitor General*
OHIO ATTORNEY GENERAL'S OFFICE
30 E. Broad Street
Columbus, OH 43215
(614) 466-8980
thomas.gaiser@ohiogo.gov
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

JONATHAN SKRMETTI
*Attorney General &*
*Reporter*

STEVEN J. GRIFFIN
*Senior Counsel for Strategic*
*Litigation & Assistant*
*Solicitor General*
TENNESSEE ATTORNEY GENERAL'S
OFFICE
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
steven.griffin@ag.tn.gov

*Counsel for the State of Tennessee*

KEN PAXTON
*Attorney General of Texas*

BRENT WEBSTER
*First Assistant Attorney General*

JAMES LLOYD
*Deputy Attorney General for*
*Civil Litigation*

KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection*
*Division*

JOHN R. HULME
*Assistant Attorney General*

WESLEY S. WILLIAMS
*Assistant Attorney General*
OFFICE OF THE ATTORNEY
GENERAL
P.O. Box 12548, MC-066
Austin, TX 78711
(512) 463-2012
john.hulme@oag.texas.gov
wesley.williams@aog.texas.gov

*Counsel for the State of Texas*

SEAN D. REYES
*Attorney General*

STANFORD E. PURSER
*Solicitor General*
UTAH ATTORNEY GENERAL'S
OFFICE
160 East 300 South, 5th Floor
Salt Lake City, UT 84114
(385) 382-4334
spurser@agutah.gov

*Counsel for the State of Utah*

PATRICK MORRISEY
*Attorney General*

MICHAEL R. WILLIAMS
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West
Virginia*

JASON MIYARES
*Attorney General*

KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
VIRGINIA ATTORNEY GENERAL'S
OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth
of Virginia*

BRIDGET HILL
*Attorney General*

D. DAVID DEWALD
*Deputy Attorney General*
OFFICE OF THE ATTORNEY
GENERAL OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-6946
david.dewald@wyo.gov

*Counsel for the State of Wyoming*

ARIZONA LEGISLATURE

WARREN PETERSEN
*President Of The Arizona*
*State Senate*

*By Counsel*:
BRUNN (BEAU) W. ROYSDEN III
FUSION LAW, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

*Counsel for President of the*
*Arizona State Senate Warren*
*Petersen*

BEN TOMA
*Speaker Of The Arizona*
*House Of Representatives*

*By Counsel*:
BRUNN (BEAU) W. ROYSDEN III
FUSION LAW, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

*Counsel for Speaker of the Arizona*
*House of Representatives Ben*
*Toma*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners the State of Oklahoma, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of South Carolina, State of Tennessee, State of Texas, Railroad Commission of Texas, Texas Commission on Environmental Quality, State of Utah, Commonwealth of Virginia, State of West Virginia, State of Wyoming, and the Arizona Legislature (collectively, "State Petitioners") certify as follows:

### A.  Parties And Amici

#### 1.  Petitioners

In Case No.24-1054, Petitioners are the State of Texas, Railroad Commission of Texas, and Texas Commission on Environmental Quality.

In Case No.24-1059, Petitioners are the State of Oklahoma, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi,

State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of South Carolina, State of Tennessee, State of Utah, Commonwealth of Virginia, State of West Virginia, State of Wyoming, and the Arizona Legislature.

In Case No.24-1101, Petitioners are the Michigan Oil and Gas Association and Miller Energy Company II, LLC.

In Case No.24-1103, Petitioners are the Independent Petroleum Association of America, Arkansas Independent Producers and Royalty Owners, Domestic Energy Producers Alliance, Eastern Kansas Oil & Gas Association, Gas and Oil Association of West Virginia, Illinois Oil and Gas Association, Independent Petroleum Association of New Mexico, Indiana Oil and Gas Association, International Association of Drilling Contractors, Kansas Independent Oil and Gas Association, Kentucky Oil and Gas Association, National Stripper Well Association, North Dakota Petroleum Council, Ohio Oil and Gas Association, Oklahoma Independent Petroleum Association, Petroleum Alliance of Oklahoma, Panhandle Producers and Royalty Owners Association, Pennsylvania Independent Oil & Gas Association, Permian Basin Petroleum Association, Petroleum Association of Wyoming, Texas Alliance of

Energy Producers, Texas Independent Producers and Royalty Owners Association, and Western Energy Alliance.

In Case No.24-1111, Petitioner is the GPA Midstream Association.

In Case No.24-1114, Petitioner is the Texas Oil and Gas Association.

In Case No.24-1115, Petitioner is the Interstate Natural Gas Association of America.

In Case No.24-1116, Petitioner is the American Petroleum Institute.

In Case No.24-1117, Petitioner is the American Exploration & Production Council.

### 2.    Respondents

Respondents in these consolidated cases are the United States Environmental Protection Agency ("EPA") and Michael S. Regan, in his official capacity as Administrator of EPA.

### 3.    Intervenors-Petitioners

Intervenor-Petitioner in these consolidated cases is Continental Resources Inc.

#### 4. Intervenors-Respondents

Intervenors-Respondents in these consolidated cases are the Center for Biological Diversity, Clean Air Council, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, Dakota Resource Council, District of Columbia, State of Wisconsin, Earthworks, Environmental Defense Fund, Environmental Law & Policy Center, Food & Water Watch, Fort Berthold Protectors of Water and Earth Rights, GreenLatinos, Natural Resources Defense Council, Sierra Club, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, Interstate Natural Gas Association of America, and American Exploration & Production Council.

#### 5. Amici

As of the time of this filing, there have been no amici.

### B. Rulings Under Review

Petitioners in these consolidated cases seek review of EPA's final rulemaking, entitled "Standards of Performance for New, Reconstructed,

and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024) ("Rule" or "Final Rule").

## C.    Related Cases

Counsel for State Petitioners are aware of the following related cases before this Court:

*Air Alliance Houston, et al. v. EPA, et al.*, No.24-1118 (D.C. Cir.) (severed from these consolidated cases per this Court's September 4, 2024, Order).

*American Petroleum Institute, et al. v. EPA, et al.*, No.24-1289 (D.C. Cir.) (consolidating challenges to certain aspects of the Rule in Case Nos.24-1116 and -1117 that this Court severed from these consolidated cases in its September 4, 2024, Order).

So far as counsel are aware, there are no other cases pending in this Court or any other court that involve the same underlying Rule.

Dated: November 25, 2024

Respectfully submitted,


/s/ Misha Tseytlin
MISHA TSEYTLIN
*Counsel of Record*
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF THE ISSUES ................................................................. 2

STATUTES AND REGULATIONS ........................................................ 3

INTRODUCTION ....................................................................................... 3

STATEMENT OF THE CASE ................................................................. 8

    A. The States Have The Primary Role In Regulating Emissions Under Section 111(d) Of The Clean Air Act .............. 8

    B. EPA First Attempts To Regulate New Sources Emitting Methane Under Section 111(b) In 2016 ................................... 11

    C. EPA Publishes Its 2024 Methane Rule Addressing Emissions From Both New And Existing Sources .................... 12

    D. State Petitioners And Others Challenge The 2024 Rule .......... 25

SUMMARY OF ARGUMENT ................................................................ 25

STANDARD OF REVIEW ...................................................................... 30

STANDING ................................................................................................ 31

ARGUMENT .............................................................................................. 31

    I. The Rule Violates Section 111(d) And The Administrative Procedure Act By Setting "Presumptive Standards Of Performance" ....................................................................................... 31

    II. The Rule's Two-Year Deadline For States To Submit Section 111(d) Plans Is Arbitrary And Capricious ...................... 38

    III. EPA Relies On An Inherently Flawed Cost-Benefit Analysis To Justify The Rule's Unreasonable And Unachievable Standards ................................................................................................ 45

    IV. The Super-Emitter Program Unlawfully Delegates EPA's Monitoring Authority To Third Parties ......................................... 55

        A. The Super-Emitter Program Violates The Clean Air Act ........ 56

        B. EPA's Attempted Delegation Of Authority To Third Parties Poses Grave Constitutional Problems ...................................... 62

CONCLUSION .......................................................................................... 67

# TABLE OF AUTHORITIES*

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) ............................................................. 63, 64, 65

*Ala. Mun. Distribs. Grp. v. FERC,*
    100 F.4th 207 (D.C. Cir. 2024) ....................................................... 55

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,*
    No. 23-5129, 2024 WL 4863140 (D.C. Cir. Nov. 22, 2024) ...... 65, 66

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp. (Amtrak I),*
    721 F.3d 666 (D.C. Cir. 2013) ......................................................... 64

*Cal. Pub. Utils. Comm'n v. Fed. Energy Reg. Comm'n,*
    20 F.4th 795 (D.C. Cir. 2021) ......................................................... 39

*Calder v. Bull,*
    3 U.S. (3 Dall.) 386 (1798) ............................................................. 64

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) .................................................................. 63, 66

*City of Portland v. EPA,*
    507 F.3d 706 (D.C. Cir. 2007) .......................................... 46, 47, 50, 55

*Dep't of Transp. v. Ass'n of Am. R.Rs. (Amtrak),*
    575 U.S. 43 (2015) .................................................................. 63, 64, 67

*EarthReports, Inc. v. FERC,*
    828 F.3d 949 (D.C. Cir. 2016) ......................................................... 54

*Fred Meyer Stores, Inc. v. Nat'l Lab. Rels. Bd.,*
    865 F.3d 630 (D.C. Cir. 2017) ......................................................... 38

*Gundy v. United States,*
    588 U.S. 128 (2019) .................................................................. 62, 63

*Halverson v. Slater,*
    129 F.3d 180 (D.C. Cir. 1997) ......................................................... 57

---

\* Authorities upon which Petitioners chiefly rely are marked with asterisks.

*Int'l Fabricare Inst. v. EPA,*
    972 F.2d 384 (D.C. Cir. 1992).........................................39

*Interstate Nat. Gas Ass'n of Am. v. FERC,*
    494 F.3d 1092 (D.C. Cir. 2007)....................................39

*Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous*
    *Materials Safety Admin.,*
    114 F.4th 744 (D.C. Cir. 2024) ...................................38

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928) ................................. 63, 64, 65, 66

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ................................................30

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ....................................................31

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..............................................45, 46

*\*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016)...............30, 38, 44, 46, 47, 49, 51, 55

*Mistretta v. United States,*
    488 U.S. 361 (1989) ....................................................63

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
    *Ins. Co.,*
    463 U.S. 29 (1983) ........................................ 30, 38, 44

*Mozilla Corp. v. FCC,*
    940 F.3d 1 (D.C. Cir. 2019) ......................................66

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012)................... 46, 47, 50, 55

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    107 F.4th 415 (5th Cir. 2024).....................................67

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002).....................................45

*Ohio v. EPA,*
    603 U.S. 279 (2024) .....................................8, 9, 39, 56

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023)......................................................64

*Sierra Club v. FERC*,
    672 F. App'x 38 (D.C. Cir. 2016) ...........................................55

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ....................................................................37

*U.S. Telecom Ass'n v. FCC*,
    359 F.3d 554 (D.C. Cir. 2004)...........................................64, 66

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ...................................................................46

*Washington ex rel. Seattle Title Tr. Co. v. Roberge*,
    278 U.S. 116 (1928) ...................................................................64

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015) ...................................................................67

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ................................................8, 32, 34, 47

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ...............................................63, 64, 65, 66

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019)...........................................54

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    82 F.4th 1273 (D.C. Cir. 2023) ....................38, 39, 44, 45

**Constitutional Provisions**

U.S. Const. art. I..............................................................................62

**Statutes And Rules**

5 U.S.C. § 706 .........................................................33, 38, 40, 56

42 U.S.C. § 7401 .............................................................................8

42 U.S.C. § 7408 .............................................................................8

42 U.S.C. § 7409 .............................................................................8

42 U.S.C. § 7410 .......................................................................8, 11

\*42 U.S.C. § 7411 .................................................................................
   1, 3, 5, 8, 9, 10, 11, 19, 21, 23, 25, 26, 31, 32, 33, 34, 36, 37,
   47

42 U.S.C. § 7412 .................................................................................8

\*42 U.S.C. § 7414.................................................. 11, 56, 57, 59, 65

42 U.S.C. § 7602 .................................................................................9

42 U.S.C. § 7604 .................................................................... 57, 58, 65

42 U.S.C. § 7607 ............................................................. 1, 30, 33, 56

Ark. Code Ann. § 8-4-311 ...............................................................61

D.C. Cir. R. 28 ...................................................................................3

Fed. R. App. P. 15 .............................................................................2

Fed. R. Evid. 301 .............................................................................37

Okla. Stat. tit. 27A, § 1-1-203 .......................................................61

S.J. Res. 14, 117th Cong., 135 Stat. 295 (2021) (enacted).....................12

Wyo. Stat. Ann. § 35-11-101...........................................................61

**Regulations**

40 C.F.R. pt. 60................................................................................62

40 C.F.R. § 60.24a ....................................................................23, 37

81 Fed. Reg. 35,824 (June 3, 2016) ...............................................12

85 Fed. Reg. 57,018 (Sept. 14, 2020) ............................................12

86 Fed. Reg. 63,110 (Nov. 15, 2021)........................................13, 36

87 Fed. Reg. 74,702 (Dec. 6, 2022) .........................13, 14, 17, 60

\*89 Fed. Reg. 16,820 (Mar. 8, 2024)...............................................
   1, 5, 18, 19, 20, 21, 22, 23, 24, 31, 33, 34, 35, 36, 40, 41, 43,
   44, 47, 48, 49, 52, 56, 58, 59, 62

**Other Authorities**

All Actions S.J.Res.14 – 117th Congress (2021–2022), Doc.EPA-
   HQ-OAR-2021-0317-0165 (Nov. 6, 2021)........................................12

Black's Law Dictionary (12th ed. 2024)................................................37

EPA, EPA's Final Rule to Reduce Methane and Other Pollution
from Oil and Natural Gas Operations: Summary of
Standards (Dec. 2023)..............................................................19, 20

EPA, Oil and Natural Gas Environmental Research Publications,
Doc.EPA-HQ-OAR-2021-0317-0100 (Nov. 2021)..........................52

EPA, Regulatory Impact Analysis for Final Rule, Doc.EPA-HQ-
OAR-2021-0317-4021 (Dec. 2023)......................................47, 48, 52

EPA, Response to Comments on Proposed Rule and Supplemental
Proposed Rule, Doc.EPA-HQ-OAR-2021-0317-4009
(Nov. 2023)...............................................................40, 47, 52, 60

EPA, Supplementary Material for the Regulatory Impact Analysis
for the Final Rulemaking: Report on the Social Cost of
Greenhouse Gases, Doc.EPA-HQ-OAR-2021-0317-4007
(Nov. 2023)..............................................................................52, 53

Exec. Off. of the President, The President's Climate Action Plan
(June 2013)...........................................................................................24

Robert S. Pindyck, *Climate Change Policy: What do the Models
Tell Us?* (Nat'l Bureau of Econ. Rsch. Working Paper
No.19244, 2013)...............................................................................54

U.S. Energy Info. Admin., *Rankings: Crude Oil Production*
(Aug. 2024) ......................................................................................49

U.S. Energy Info. Admin., *Rankings: Natural Gas Marketed
Production* (2023) ..........................................................................49

# GLOSSARY

| | |
|---|---|
| **2016 Rule** | 81 Fed. Reg. 35,824 (June 3, 2016) |
| **2020 Rule** | 85 Fed. Reg. 57,018 (Sept. 14, 2020) |
| **Alaska Comment** | Alaska Dep't of Env't Conservation Comment, Doc.EPA-HQ-OAR-2021-0317-2327 (Feb. 13, 2023), JA___ |
| **Ark. Comment** | Ark. Dep't of Energy & Env't Comment, Doc.EPA-HQ-OAR-2021-0317-2322 (Feb. 13, 2023), JA___ |
| **EPA** | Environmental Protection Agency |
| **EPA Final Rule Summary of Standards** | EPA, EPA's Final Rule to Reduce Methane and Other Pollution from Oil and Natural Gas Operations: Summary of Standards (Dec. 2023) |
| **EPA Regulatory Impact Analysis** | EPA, Regulatory Impact Analysis for Final Rule, Doc.EPA-HQ-OAR-2021-0317-4021 (Dec. 2023), JA___ |
| **EPA Response to Comments** | EPA, Response to Comments on Proposed Rule and Supplemental Proposed Rule, Doc.EPA-HQ-OAR-2021-0317-4009 (Nov. 2023), JA___ |
| **EPA Supplementary Social Cost Report** | EPA, Supplementary Material for the Regulatory Impact Analysis for the Final Rulemaking: Report on the Social Cost of Greenhouse Gases, Doc.EPA-HQ-OAR-2021-0317-4007 (Nov. 2023), JA___ |
| **N.D. Comment** | N.D. Indus. Comm'n & Dep't of Env't Quality Comment, Doc.EPA-HQ-OAR-2021-0317-2237 (Feb. 13, 2023), JA___ |

| | |
|---|---|
| **Okla. Dep't of Env't Quality Comment** | Okla. Dep't of Env't Quality Comment, Doc.EPA-HQ-OAR-2021-0317-0200 (Nov. 30, 2021), JA___ |
| **Okla. Sec'y Comment** | Okla. Sec'y of Energy & Env't Comment, Doc.EPA-HQ-OAR-2021-0317-2393 (Feb. 13, 2023), JA___ |
| **Rule or Final Rule** | "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024), JA___ |
| **State Petitioners' Feb. 2023 Comment** | West Virginia, *et al.*, Comment, Doc.EPA-HQ-OAR-2021-0317-2292 (Feb. 13, 2023), JA___ |
| **State Petitioners' Jan. 2022 Comment** | West Virginia, *et al.*, Comment, Doc.EPA-HQ-OAR-2021-0317-0790 (Jan. 31, 2022), JA___ |
| **Super-Emitter Program** | EPA program established by the Final Rule that would allow third-party entities to investigate, monitor, and report to EPA any methane-leak events |
| **Utah Comment** | Utah Pub. Lands Pol'y Coordinating Off. & Dep't of Nat. Res. Comment, Doc.EPA-HQ-OAR-2021-0317-2241 (Feb. 13, 2023), JA___ |
| **Wyo. Comment** | Wyo. Dep't of Env't Quality Comment, Doc.EPA-HQ-OAR-2021-0317-2220 (Feb. 13, 2023), JA___ |

## JURISDICTIONAL STATEMENT

Pursuant to Federal Rule of Appellate Procedure 28(a)(4) and Circuit Rule 28(a)(4), State Petitioners provide the following Jurisdictional Statement:

State Petitioners are challenging Respondent Environmental Protection Agency's ("EPA") final rulemaking, entitled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (Mar. 8, 2024), JA___ ("Rule" or "Final Rule"). EPA has authority to set standards of performance for new, reconstructed, and modified sources and issue emission guidelines for existing sources under 42 U.S.C. § 7411(b), (d).

This Court has jurisdiction over State Petitioners' Petitions For Review. 42 U.S.C. § 7607(b)(1).

Jurisdiction is proper because State Petitioners timely filed their Petitions. *Id.* State Petitioners filed their Petitions within 60 days of the Final Rule's March 8, 2024, publication date. Case No.24-1054, Dkt.2044039; Case No.24-1059, Dkt.2045175. State Petitioners filed

their Petitions in accordance with Rule 15(a) of the Federal Rules of Appellate Procedure. Fed. R. App. P. 15(a).

This Court consolidated Petitioners' Petitions For Review under Case No.24-1054.

## STATEMENT OF THE ISSUES

1. Whether the Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law by establishing presumptive standards that States are effectively forced to adopt in implementing their own plans to govern existing emission sources and adopting other measures that deprive States of the authority the Clean Air Act affords them.

2. Whether the Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law by affording States only two years to submit implementation plans for new Clean Air Act Section 111(d) requirements, despite unrebutted evidence that States will not be able to meet that timeline.

3. Whether the Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law because EPA's cost-benefit analysis relies on flawed metrics and data to impermissibly

amplify the benefits of the Final Rule while understating the Final Rule's costs.

4. Whether the Final Rule is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law by establishing a so-called "Super-Emitter Program" that has no logical basis in the Clean Air Act and that would, in any event, violate the Constitution's separation-of-powers and nondelegation principles.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum to this Brief. D.C. Cir. R. 28(a)(5).

## INTRODUCTION

The Final Rule here requires States to regulate methane emissions from hundreds of thousands of existing oil-and-gas facilities under Section 111(d) of the Clean Air Act. 42 U.S.C. § 7411(d). Those facilities are key components in the production, processing, transmission, and storage of oil and gas. Many States have never regulated these facilities at all, while others have issued only limited regulation that respects their importance to their States' economies. So, for example, while Oklahoma had previously regulated only about 10,000 existing oil-and-gas facilities

within its borders, the Final Rule now requires this State to impose onerous, crushing regulations on 200,000 such facilities.

The Final Rule achieves its regulatory ends by imposing illegal "presumptive standards of performance" for these existing sources that EPA effectively forces States to adopt. These presumptive standards are extremely onerous, imposing zero- or near-zero-emission limitations on covered facilities (under the Final Rule's presumptive performance standards) or expensive technological equipment, procedures, and updates on those facilities (under the Rule's presumptive work practice standards). And the Final Rule creates a new extra-statutory "Super-Emitter Program" as an enforcement mechanism, under which EPA will deputize third parties to identify methane-release events (such as leaks) and notify EPA (not the States) to trigger enforcement.

The Final Rule is unlawful in numerous respects.

First, EPA crafted the Final Rule around the so-called "*presumptive standards of performance*," which force States to overcome near-impossible evidentiary burdens if they wish to tailor the regulation of these existing sources to their local, state-specific conditions—as Section 111(d) expressly empowers them to do. Section 111(d) gives the

States—to the exclusion of EPA—the authority to select the standards of performance for existing sources, including by adopting lesser emission limitations as appropriate after the State considers a source's remaining useful life and other factors. Yet, the Final Rule's presumptive standards violate that allocation of authority between the States and EPA by strongarming the States into adopting the standards of performance that EPA itself prefers across the board. Indeed, EPA insists it would be "*extremely unlikely* that a state could demonstrate, based on costs relative to remaining useful life," that the Rule's presumptive standards are "unreasonable" for a particular facility, 89 Fed. Reg. at 17,004, JA___ (emphasis added)—notwithstanding the States' plain statutory right under Section 111(d) to tailor the standards of performance for existing facilities based on their remaining useful life and other factors, 42 U.S.C. § 7411(d)(1).

Second, the two-year deadline that the Final Rule imposes upon the States to submit their Section 111(d) plans is arbitrary and capricious. Many States explained to EPA in voluminous public comments that they needed three years to submit rule-compliant Section 111(d) plans, especially given that the Rule contemplates the States regulating

hundreds of thousands of diverse oil-and-gas facilities for the first time. Yet, EPA provided no meaningful response, even as it chose a truncated two-year timeline for plan submission. Of course, EPA's reason for adopting this shortened timeline is as obvious as it is unlawful: the agency wants to force States to adopt the presumptive standards, so it gave them an insufficient amount of time to develop the record necessary to rebut EPA's illegal presumption and develop their own approach.

Third, the Final Rule fails to carry EPA's burden of conducting a reasoned cost-benefits analysis, independently rendering the Rule arbitrary and capricious. To begin, EPA gave no meaningful consideration to the compliance costs of the Final Rule for state agencies. But those costs are a crucial consideration, and EPA received numerous public comments to this effect. EPA further erred by weighing the total compliance costs nationwide, rather than conducting a state-specific analysis that respects that oil-and-gas facilities are highly concentrated in some States. And EPA unreasonably relied upon the flawed social-cost-of-carbon metric to justify the Final Rule's substantial costs for regulated entities, a metric that other agencies have properly rejected as inadequately accurate to warrant consideration.

Finally, the Final Rule's "Super-Emitter Program" exceeds EPA's authority under the Clean Air Act, as nothing in the Act authorizes EPA to create a federal/private-citizen enforcement regime for emissions violations. Indeed, the only provision of the Act that does allow EPA to delegate its enforcement authority specifies the States—and only the States—as the recipients of any such delegation. Even if somehow statutorily authorized, the Super-Emitter Program violates constitutional principles of nondelegation and the separation of powers. Congress cannot empower agencies to delegate their enforcement authority to private parties or, at the very least, could not authorize unchecked executive delegation to such private parties. But EPA did just that here by deputizing third parties to trigger enforcement of the Final Rule.

The Court should vacate the Section 111(d) and Super-Emitter Program portions of the Final Rule and remand to EPA for further consideration consistent with the Court's decision.

**STATEMENT OF THE CASE**

**A.    The States Have The Primary Role In Regulating Emissions Under Section 111(d) Of The Clean Air Act**

"The Clean Air Act envisions States and the federal government working together to improve air quality." *Ohio v. EPA*, 603 U.S. 279, 283 (2024).   Within the Act's cooperative-federalism framework, Congress created "three main regulatory programs to control air pollution from stationary sources such as power plants," including the New Source Performance Standards program under Section 111, at issue here.  *West Virginia v. EPA*, 597 U.S. 697, 707 (2022); *see* 42 U.S.C. §§ 7408–10 (National Ambient Air Quality Standards program); *id.* § 7411 (New Source Performance Standards program); *id.* § 7412 (Hazardous Air Pollutants program).   As its title suggests, Section 111's New Source Performance Standards program is primarily dedicated to setting "emissions limits for *new* and *modified* sources," although it also addresses the "regulation of certain pollutants from *existing* sources" in Section 111(d).   *West Virginia*, 597 U.S. at 709–10.   Section 111(d) specifically recognizes the "responsibility of States" in controlling air pollution in their respective regions consistent with their unique challenges and circumstances, 42 U.S.C. § 7401(a)(3); *see id.* § 7411(d),

thus reflecting the principles of cooperative federalism on which the Act rests, *see Ohio*, 603 U.S. at 283.

Section 111(b) requires EPA to "publish (and from time to time . . . revise) a list of categories of stationary sources." 42 U.S.C. § 7411(b)(1)(A). Section 111(b) then directs EPA to establish nationally applicable "standards of performance" for *new* sources within that category. *Id.* § 7411(b)(1)(B). Section 111(a)(1) defines "standard of performance" to mean "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction" that EPA "determines has been adequately demonstrated." *Id.* § 7411(a)(1).

Under the Clean Air Act, an "emission limitation" is a "requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." *Id.* § 7602(k). Thus, EPA's "standard of performance" for each category of new sources must reflect the emission limitation that can be achieved by "the application of the best system of emission reduction" that "has been adequately demonstrated" to limit emissions from an individual source on a continuous basis, after considering cost and other factors. *Id.* § 7411(a)(1).

Section 111(h) permits EPA to establish a "work practice" standard if EPA determines that "it is not feasible to prescribe or enforce a standard of performance." *Id.* § 7411(h)(1)–(2). That is, in such circumstances, EPA "may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which reflects the best *technological system of continuous emission reduction*" that "has been adequately demonstrated" to limit emissions from an individual source, after considering cost and other factors. *Id.* (emphasis added); *see id.* § 7411(h)(3)–(5). A "technological system of continuous emission reduction" is either "a technological process for production or operation by any source which is inherently low-polluting or nonpolluting" or "a technological system for continuous reduction of the pollution . . . before [it] is emitted into the ambient air." *Id.* § 7411(a)(7).

While Section 111(b) authorizes EPA to impose standards of performance on *new* sources, Section 111(d)'s regime for regulation of *existing* sources is largely state-run. Section 111(d) only empowers EPA to identify "the best system of emission reduction" and the "degree of emission limitation achievable through application of" that system. *Id.* § 7411(a), (d), (g). Critically, that Section then authorizes the States to

set their own "standards of performance" for existing sources within their borders. *Id.* § 7411(d). EPA's role in this process is limited, "similar to that provided by section 7410 [of the Clean Air Act]" governing the development of state implementation plans. *Id.* § 7411(d)(1). Thus, EPA *must* approve any state plans that are reasonable and meet the requirements of the Act. *See id.* § 7410(k)(3). EPA cannot impose its own standards to regulate existing sources except if a "State fails to submit" or "enforce" a "satisfactory plan," in which event EPA may "prescribe a plan for [the] State" and "enforce the provisions of such plan." *Id.* § 7411(d)(2).

Section 114 of the Clean Air Act authorizes EPA to gather the information needed to enforce Section 111. *Id.* § 7414. It empowers EPA to inspect and monitor stationary sources that are subject to standards of performance under Section 111, *id.* § 7414(a), (d), while also allowing EPA to delegate its enforcement authority to any State that submits an "adequate" enforcement proposal, *id.* § 7414(b).

## B. EPA First Attempts To Regulate New Sources Emitting Methane Under Section 111(b) In 2016

In June 2016, EPA used its Section 111 authority to directly regulate methane emissions from new sources in the oil-and-gas sector,

using EPA's Section 111 authority.  81 Fed. Reg. 35,824 (June 3, 2016) ("2016 Rule").  The 2016 Rule announced EPA's intention "to regulate emissions from *existing* sources," explaining that EPA "will begin with a formal process to require companies operating existing oil and gas sources to provide information to assist" with that process.  *Id.* at 35,831–32 (emphasis added).

Many States challenged the 2016 Rule, *see, e.g.*, Pet. For Review, *West Virginia v. EPA*, No.16-1264 (D.C. Cir. Aug. 2, 2016), and—following a change of administration—EPA issued a new rulemaking that effectively rescinded the 2016 Rule's provisions regulating new sources emitting methane, 85 Fed. Reg. 57,018 (Sept. 14, 2020) ("2020 Rule").  Then, in 2021, Congress passed, and President Biden signed, a joint resolution disapproving of the 2020 Rule under the Congressional Review Act.  S.J. Res. 14, 117th Cong., 135 Stat. 295 (2021) (enacted); *see also* All Actions S.J.Res.14 – 117th Congress (2021–2022), Doc.EPA-HQ-OAR-2021-0317-0165 (Nov. 6, 2021), JA___.

## C.  EPA Publishes Its 2024 Methane Rule Addressing Emissions From Both New And Existing Sources

In late 2021, EPA proposed a new methane rule that would reimpose and expand the stringent emissions controls in the 2016 Rule

and—for the first time—regulate an extensive range of existing oil-and-gas sources under Section 111(d), including numerous oil-well components and operations. 86 Fed. Reg. 63,110, 63,169–85 (Nov. 15, 2021), JA___–___; *see also* 87 Fed. Reg. 74,702, 74,722–842 (Dec. 6, 2022), JA___–___ (supplemental proposed rule). For existing sources, the proposed rule imposed stringent "presumptive standards," many with zero or near-zero methane-emission limitations, that EPA pressed States to adopt in their Section 111(d) plans in lieu of developing their own performance standards. 86 Fed. Reg. at 63,249–51, JA___–___. The proposed rule included an 18-month timeline for the States to develop and submit to EPA their Section 111(d) plans implementing standards of performance for the many categories of newly regulated, existing sources. 87 Fed. Reg. at 74,831, JA___; *see also* 86 Fed. Reg. at 63,255–56, JA___–___. The proposed rule did not adequately address the significant compliance costs for the States, estimating "[t]he burden for States to develop State plans . . . to be below $100 million in any one year," while dismissively promising unspecified "aid and guidance to States through the plan development process." 86 Fed. Reg. at 63,260–61, JA___–___. The proposed rule also outlined a so-called "Super-Emitter Program" that

would deputize third-party entities to investigate, monitor, and report to EPA any methane-leak events within a given State—without state involvement.  87 Fed. Reg. at 74,746–55, JA___–___.

Many interested parties—including State Petitioners—submitted detailed comments objecting to the proposed rule's "presumptive standards" for their Section 111(d) plans.  *See, e.g.*, West Virginia, *et al.*, Comment at 4–7, Doc.EPA-HQ-OAR-2021-0317-2292 (Feb. 13, 2023), JA___–___ ("State Petitioners' Feb. 2023 Comment"); Okla. Sec'y of Energy & Env't Comment, Att.A at 14–15, Doc.EPA-HQ-OAR-2021-0317-2393 (Feb. 13, 2023), JA___–___ ("Okla. Sec'y Comment"); Alaska Dep't of Env't Conservation Comment at 3–6, Doc.EPA-HQ-OAR-2021-0317-2327 (Feb. 13, 2023), JA___–___ ("Alaska Comment").  Commenters raised concerns about EPA using these "standards" to heighten the burden for state plans and diminish the States' statutory role under Section 111(d).  *See, e.g.*, State Petitioners' Feb. 2023 Comment, *supra*, at 5–7, JA___–___; Okla. Sec'y Comment, Att.A at 14–15, JA___–___.  EPA's presumptive standards limited States' authority under Section 111(d) to consider the remaining useful life of facilities in their

plan submissions under the proposed rule. *See, e.g.,* Okla. Sec'y Comment, *supra*, Att.B at 4–5, JA___–___.

State Petitioners also objected to the truncated timeline for submitting state plans. Specifically, they explained that at least a three-year timeline was absolutely essential, *see, e.g.*, Okla. Sec'y Comment, *supra*, at 19–20, JA___–___; Ark. Dep't of Energy & Env't Comment at 5–6, Doc.EPA-HQ-OAR-2021-0317-2322 (Feb. 13, 2023), JA___–___ ("Ark. Comment"); Wyo. Dep't of Env't Quality Comment at 23, Doc.EPA-HQ-OAR-2021-0317-2220 (Feb. 13, 2023), JA___ ("Wyo. Comment"); *accord* Utah Pub. Lands Pol'y Coordinating Off. & Dep't of Nat. Res. Comment at 4–5, Doc.EPA-HQ-OAR-2021-0317-2241 (Feb. 13, 2023), JA___–___ ("Utah Comment"), while emphasizing that this additional time was needed given that EPA was proposing to regulate hundreds of thousands of diverse oil-and-gas facilities for the first time, *see* Okla. Sec'y Comment, *supra*, at 20, JA___; Okla. Dep't of Env't Quality Comment at 2, Doc.EPA-HQ-OAR-2021-0317-0200 (Nov. 30, 2021), JA___ ("Okla. Dep't of Env't Quality Comment"). Because the proposed rule would cover "thousands of additional sources for oil and gas states," Okla. Sec'y Comment, *supra*, at 20, JA___; *see also* Okla. Dep't of Env't Quality

Comment, *supra*, at 2, JA___, the "sheer number of new regulated entities—and the quantity of data that these new regulations will require—would make it extraordinarily challenging for States to develop a plan" in a shorter time period, West Virginia., *et al.*, Comment at 16, Doc.EPA-HQ-OAR-2021-0317-0790 (Jan. 31, 2022), JA___ ("State Petitioners' Jan. 2022 Comment"); *accord* Ark. Comment, *supra*, at 5–6, JA___–___; Utah Comment, *supra*, at 4–5, JA___–___; Wyo. Comment, *supra*, at 6–9, JA___–___.

State Petitioners also submitted comments disputing EPA's cost-benefit analysis conducted to support the proposed rule's stringent requirements. Many of these comments emphasized that EPA failed to consider properly the compliance costs that the proposed rule would impose on state regulators, *see, e.g.*, Wyo. Comment, *supra*, at 5–6, 13–15, JA___–___, JA___–___; State Petitioners' Jan. 2022 Comment, *supra*, at 12–14, JA___–___; Utah Comment, *supra*, at 17–18, JA___–___; Kan. Dep't Health & Env't Comment at 5, Doc.EPA-HQ-OAR-2021-0317-2337 (Feb. 12, 2023), JA___, especially given the outsized impact of the proposed rule on certain States, *see, e.g.*, Okla. Sec'y Comment, *supra*, at 19–21, JA___–___. Multiple commenters also took issue with EPA's

consideration of the "social cost" of greenhouse gas pollution.  *See, e.g.*, Wyo. Comment, *supra*, at 12–13, JA___–___; N.D. Indus. Comm'n & Dep't of Env't Quality Comment at 7–11, Doc.EPA-HQ-OAR-2021-0317-2237 (Feb. 12, 2023), JA___–___ ("N.D. Comment"); State Petitioners' Feb. 2023 Comment, *supra*, at 10, JA___.

Commenters, including many State Petitioners, additionally raised serious concerns with the proposed rule's Super-Emitter Program, *see, e.g.*, State Petitioners' Feb. 2023 Comment, *supra*, at 5, 8–9, JA___, JA___–___, which, as noted above, would empower qualifying third parties to investigate and report super-emitter events to EPA without any requirement that such events be reported to the States, 87 Fed. Reg. at 74,746–55, JA___–___.  Commenters explained that EPA lacks authority to delegate its investigatory enforcement authority to private citizens, while also delineating the many practical problems that such a program would create.  State Petitioners' Feb. 2023 Comment, *supra*, at 5, 8–9, JA___, JA___–___; Ark. Comment, *supra*, at 6–7, JA___–___; Alaska Comment, *supra*, at 2–3, JA___–___; Wyo. Comment, *supra*, at 9–11, JA___–___; Okla. Sec'y Comment, *supra*, at 11–13, 15–16, JA___–___, JA___–___; Utah Comment, *supra*, at 5–6, JA___–___.

On March 8, 2024, EPA promulgated the Final Rule challenged here. *See* 89 Fed. Reg. 16,820, JA___. Under Section 111(b), the Final Rule imposes standards of performance for both methane and volatile-organic-compound emissions from new sources spanning the oil-and-gas industry's production, processing, transmission, and storage segments. *Id.* at 16,871–902, JA___–___. In addition—and most relevant here—the Final Rule contains numerous, stringent methane-emission limitations for existing sources and imposes onerous requirements for state plans under Section 111(d). The categories of existing sources that the Final Rule covers include well sites, centralized production facilities, and compressor stations, *id.* at 16,871–73, 16,885–91, JA___–___, JA___–___, as well as facility components used in oil-and-gas production, processing, transportation, and storage—such as process controllers, pumps, *id.* at 16,881–84, JA___–___, centrifugal compressors, combustion control devices, reciprocating compressors, and storage vessels, *id.* at 16,891–99, JA___–___. These existing sources are key components in the production, processing, transmission, and storage of oil and gas. *See id.* at 16,823–25, JA___–___. None were regulated under Section 111(d) until EPA promulgated the Final Rule. *Id.* at 16,823, JA___.

Instead of following Section 111(d)'s directive that the States have the authority to "establish[ ] standards of performance for [ ] existing source[s]," 42 U.S.C. § 7411(d)(1), the Final Rule sets "presumptive standards" of performance, 89 Fed. Reg. at 16,829, 17,006, JA___, JA___. These presumptive standards are identical to the Final Rule's new source performance standards in most regards. *Id.* at 16,830–35, tbls.3–4, JA___–___; *see also* EPA, EPA's Final Rule to Reduce Methane and Other Pollution from Oil and Natural Gas Operations: Summary of Standards (Dec. 2023) ("EPA Final Rule Summary of Standards").[2] Indeed, out of twenty-seven stationary source categories identified by EPA in its summary of the Final Rule's standards, EPA imposed presumptive standards for twenty of them. 89 Fed. Reg. at 16,830–35, tbls.3–4, JA___–___. Seventeen of the final presumptive standards for methane emissions are the same as the standards for new sources in those categories. *Id.*, JA___–___. Two of the remaining covered source categories have presumptive standards with no corresponding new source performance standard, as they only cover existing wells. *Id.*,

---

[2] Available at https://www.epa.gov/system/files/documents/2023-12/summary-of-key-requirements-table.pdf (all websites last visited Nov. 22, 2024).

JA___–___.  So under the Final Rule, *only one covered source has a less stringent presumptive standard* for existing sources, *id.*, JA___–___; EPA Final Rule Summary of Standards, *supra*—even though the burdens of retrofitting and modifying existing sources has long been thought to be greater.

The Final Rule's presumptive standards include nine standards of performance and eleven work practice standards that require specific technologies, processes, and methods that—in EPA's view—States must employ to reach certain emission-reduction levels that EPA believes are necessary.  89 Fed. Reg. at 16,833–35, JA___–___.

The nine performance standards are the epitome of stringency.  For natural-gas-driven pumps, which are used at numerous oil-and-gas facilities (including well sites, centralized production facilities, onshore natural gas processing plants, and compressor stations), the Rule's "presumptive standard" mirrors the standard of performance for new sources—a zero-emission standard for any covered facility with electrical power or more than three pumps.  *Id.* at 16,883–85, JA___–___.  Likewise, all existing natural-gas-driven process controllers must achieve a methane-emission rate of zero, *id.* at 16,923–30, JA___–___—the same

standard that the Final Rule imposes on new sources in this category, *id.* at 16,830–31, JA___–___.

The Final Rule's other eleven presumptive standards are work practice standards. *Id.* at 16,833–35, JA___–___. These presumptive work practice standards direct oil-and-gas facilities to use specific technology, processes, and procedures that EPA has decided "reflect[ ] the best technological system of continuous emission reduction." 42 U.S.C. § 7411(h)(1). For example, the Final Rule lists as a "presumptive standard" for "Single Wellhead Only Well Sites and Small Well Sites" and "Multi-wellhead Only Well Sites" quarterly "audible, visual, and olfactory" monitoring, with multi-wellhead only well sites also requiring semiannual monitoring via more expensive optical gas imaging. 89 Fed. Reg. at 16,820, 16,830–33, JA___, JA___–___. For "existing oil wells" that produce "associated gas," the Final Rule designates two "presumptive standard[s]" "based on the amount (mass) of methane in the associated gas" produced by a covered well. *Id.* at 16,889, JA___. For wells producing less than forty tons of methane per year, the Final Rule requires the associated gas to be recovered and collected and, if possible, rerouted and used for a beneficial purpose, or alternatively, routed to a

flare or other control device that achieves at least 95-percent reduction in methane emissions. *Id.*, JA___.

The Final Rule also imposes extra-statutory requirements that States must meet if their plans deviate from EPA's presumptive standards. *Id.* at 16,892, 17,006, JA___, JA___. States must demonstrate "unreasonable cost" and "physical impossibility," among other showings, to justify submitting a plan that adopts different standards or methods from those urged by the Final Rule. *Id.* at 17,002, JA___. The Final Rule also directs States to identify "fundamental differences" between the information available to the States and the information that was available to EPA, noting that EPA's judgment will prevail if EPA and a State draw different conclusions from the same data sets. *Id.*, JA___. EPA makes clear that any deviation from the presumptive standards will prompt its "thorough[ ] review[ ]." *Id.* at 17,006, JA___.

The Final Rule's "one-size-fits-all" standards thus curtail the States' express statutory authority under Section 111(d) to tailor their plans to their own circumstances. *See* Alaska Comment, *supra*, at 5–6, JA___–___. For instance, the Act contemplates that States may permit sources to achieve less emission reduction after "tak[ing] into

consideration, among other factors, the remaining useful life of the existing source to which such standard applies." 42 U.S.C. § 7411(d)(1). But under the Final Rule, States may only exercise their statutory rights to consider the remaining useful life of a facility and choose to apply a less burdensome emission limitation on that facility after satisfying specific, heightened requirements that the Rule lays out. *See* 89 Fed. Reg. at 17,002–05, JA___–___ (incorporating 40 C.F.R. § 60.24a (subpart Ba)). EPA itself admits that it "believes it would be extremely unlikely that a state could demonstrate, based on costs relative to remaining useful life," that the Final Rule's presumptive standards are "unreasonable" for a particular facility. *Id.* at 17,004, JA___.

And even States that already regulate methane under state-law programs must complete this burdensome process, as the Final Rule rejects a "total program evaluation" option that would have allowed a more streamlined plan review process for such States. *Id.* at 16,997–7,000, JA___–___.

The Final Rule further mandates that States must submit plans to EPA establishing the standards of performance for covered existing sources within two years. *Id.* at 16,978, JA___. While the Final Rule

acknowledged many States' comments objecting to a shortened timeline, it failed to address State Petitioners' core argument that they needed three years to submit Section 111(d) plans due to the diversity and number of the covered oil-and-gas facilities. *Compare supra* pp.15–16, *with* 89 Fed. Reg. at 17,010, JA\_\_\_. Likewise, the Rule failed to account for the time needed to complete state-law-specific processes that certain States require before submitting Section 111(d) plans. *See* 89 Fed. Reg. at 16,997–7,000, JA\_\_\_–\_\_\_. EPA further failed to explain how this claimed urgency comports with its own delay of more than a decade. *See generally id.* at 17,010, JA\_\_\_; Exec. Off. of the President, The President's Climate Action Plan 10–11 (June 2013).[3]

Finally, the Final Rule adopted the extra-statutory Super-Emitter Program that authorizes EPA to deputize third parties to investigate methane-release events independently and report any findings to EPA, not the States. 89 Fed. Reg. at 16,876–81, JA\_\_\_–\_\_\_.

---

[3] Available at https://obamawhitehouse.archives.gov/sites/default/file s/image/president27sclimateactionplan.pdf.

**D.   State Petitioners And Others Challenge The 2024 Rule**

In March 2024, State Petitioners filed petitions for review challenging the Rule in this Court under the Administrative Procedure Act.  *See* Case No.24-1054, Dkt.2044039; Case No.24-1059, Dkt.2045175. Many other parties also challenged the Rule, with this Court consolidating the challenges.  *See, e.g.*, Case No.24-1054, Dkt.2045181.

## SUMMARY OF ARGUMENT

I. The Final Rule's "presumptive standards" for existing sources violate both Section 111(d) of the Clean Air Act and the Administrative Procedure Act by diminishing the States' statutory authority to create their own Section 111(d) plans that consider their specific circumstances, including "the remaining useful life" of facilities within their borders.

A. Consistent with the Clean Air Act's cooperative-federalism regime, Congress defined distinct roles for EPA and the States in the regulation of certain pollutants from existing sources in Section 111(d). Section 111(d) only authorizes EPA to determine the best system of emission reduction and the degree of emission limitation achievable for certain pollutants.  42 U.S.C. § 7411(a), (d).  The States then have the primary role of developing Section 111(d) plans for existing sources,

which plans establish the standards of performance for any covered existing source for certain air pollutants. *Id.* § 7411(d). Section 111(d) gives States the authority to develop their own standards of performance to meet EPA's emissions guidelines, including giving States the option of requiring less reduction after taking into consideration, among other factors, the remaining useful life of the existing source to which such standard applies. *Id.* § 7411(d)(1). Only when a State fails to submit a lawful plan may EPA develop its own standards of performance for existing sources by imposing a federal plan. *Id.* § 7411(d)(2)(A).

B. The Final Rule violates Section 111(d) by imposing presumptive standards that significantly limit the States' ability to implement Section 111(d) plans of their own design, upsetting the Clean Air Act's cooperative-federalism balance. Under the Rule, the States must rebut EPA's "presumptive standards" before they may establish their own standards. EPA itself acknowledges that burden is difficult to satisfy— and it is made even less feasible by the Rule's truncated two-year deadline for submitting state plans. That presumption significantly limits the States' statutory authority to impose a less stringent standard of performance on an existing source if such a standard is justified after

considering a facility's remaining useful life or other factors. Moreover, many of the Rule's presumptive standards are incredibly stringent and burdensome, leaving States with no room to deviate from EPA's unlawful presumptions. By requiring additional justification from any State that chooses to depart from EPA's presumptive standards, the Rule violates Section 111(d) and contravenes Congress' balance of federal-state power here.

II. The Final Rule's truncated two-year deadline for the States to submit Section 111(d) plans is arbitrary and capricious. The Administrative Procedure Act requires agencies to engage in reasoned decisionmaking when promulgating rules, including by responding to relevant comments raising important concerns. Here, State Petitioners and others explained in comments during the rulemaking process that many States needed at least three years to prepare a state plan under Section 111(d), especially given that the Rule contemplates regulating hundreds of thousands of diverse oil-and-gas facilities for the first time. Yet, the Final Rule adopted its two-year deadline for plan submission without explaining how that shortened deadline would provide States with sufficient time to develop their own standards of performance under

Section 111(d)—including after considering the remaining useful life of a facility and other factors. That failure to provide any meaningful response to State Petitioners' important concern renders the Final Rule's two-year deadline arbitrary and capricious.

III. The Final Rule is also arbitrary and capricious because EPA's cost-benefit analysis is fatally flawed. When an agency relies on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule arbitrary and capricious, given the requirement that agencies engage in reasoned decisionmaking. Here, the Final Rule's cost-benefit analysis is inaccurate and incomplete in three respects. First, EPA did not meaningfully consider the significant costs that the States will incur complying with the Rule. Second, even if EPA had included the States' costs in its analysis, its approach was still fundamentally flawed, as it weighed the total compliance costs nationwide. It should have instead analyzed state-specific impacts and resulting compliance costs given the concentration of oil-and-gas facilities in certain States. Finally, EPA unreasonably relied on a faulty social-cost-of-carbon metric to justify the Rule's substantial costs for regulated entities.

IV. Finally, the Final Rule's Super-Emitter Program exceeds EPA's authority under the Clean Air Act and raises significant concerns under the Constitution's separation-of-powers and nondelegation doctrines.

A. Congress delegated authority to EPA to enforce the provisions of Section 111, while also authorizing EPA to delegate that enforcement role to the States—and only the States—under certain circumstances. Yet, with the Super-Emitter Program, EPA purported to delegate its Section 111 enforcement authority to deputized private parties. That surpasses the Clean Air Act's limits on EPA's powers under Section 111, upends the Act's cooperative-federalism balance, and creates significant practical problems for the States and facility owners and operators alike.

B. The Constitution's separation-of-powers and nondelegation principles limit Congress' ability to delegate authority to other entities, while also prohibiting agencies from further delegating to private parties the agency's own delegated authority from Congress—especially where unchecked. If the Super-Emitter Program were somehow authorized by the Clean Air Act, it would raise grave concerns with the Constitution's separation-of-powers and nondelegation doctrines. With the Super-Emitter Program, EPA would deputize private citizens to perform EPA's

own investigatory duties under Section 111. The Constitution does not allow private actors to wield EPA's investigatory powers in this way. Among other things, such delegation would insulate the executive branch from the accountability that the Constitution requires of the coordinate branches.

## STANDARD OF REVIEW

This Court must hold unlawful and set aside EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "in excess of statutory . . . authority . . . or short of statutory right." 42 U.S.C. § 7607(d)(9). This Court "must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). Further, to survive arbitrary-and-capricious review, EPA must "examine the relevant data and articulate a satisfactory explanation for its action," consider all of "the relevant factors" and all "important aspect[s] of the problem," and "offer[ ] an explanation" consistent with "the evidence before the agency." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 714, 718 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## STANDING

State Petitioners have standing to challenge the Final Rule because they are "object[s] of the action" in the rulemaking. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). Specifically, the Final Rule sets presumptive standards and a two-year submission deadline for State Petitioners' Section 111(d) plans, 89 Fed. Reg. at 16,829, 16,978, 17,006, JA___, JA___, JA___, which plans EPA may disapprove if it finds that they do not comply with the Final Rule's requirements, 42 U.S.C. § 7411(d)(2). Further, the Final Rule also imposes a Super-Emitter Program, 89 Fed. Reg. at 16,876–81, JA___–___, which infringes upon State Petitioners' rights and interests in numerous respects by purporting to delegate to private parties authority that the Clean Air Act says EPA can only delegate to the States.

## ARGUMENT

## I. The Rule Violates Section 111(d) And The Administrative Procedure Act By Setting "Presumptive Standards Of Performance"

A. Section 111(d) of the Clean Air Act governs the regulation of existing sources, while giving the States a central role in selecting how to regulate such sources in their boundaries. EPA's authority under

Section 111(d) is limited to identifying the best system of emission reduction for existing sources and the degree of emission limitation achievable through the application of that system. 42 U.S.C. § 7411(a), (d). After EPA performs that limited role, Section 111(d) then authorizes the States to set their own "standards of performance" for existing sources within their borders to meet either EPA's emissions guidelines or a lower threshold. The States determine the most appropriate standards after "tak[ing] into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." *Id.* § 7411(d)(1). Thus, it is the States, not EPA, that "set the actual rules governing existing" sources to meet the emissions guidelines set by EPA. *West Virginia*, 597 U.S. at 710. Only if a State has "fail[ed] to submit a satisfactory plan" to EPA under Subsection 111(d) may EPA then develop its own standards of performance for existing sources by imposing a federal plan. 42 U.S.C. § 7411(d)(2)(A).

B. Here, the Final Rule violates Section 111(d) because it purports to impose "presumptive standards of performance" upon the States' Section 111(d) plan submissions—meaning that States must rebut EPA's "presumptive standards" before they may establish their own standards,

89 Fed. Reg. at 16,829–30, 16,833–35, 16,889, 16,995, JA___–___, JA___–___, JA___, JA___.  That approach unlawfully diminishes the statutory role that Congress defined for the States, while arrogating to EPA a key portion of the States' Section 111(d) authority.  *See* 42 U.S.C. § 7607(d)(9); 5 U.S.C. § 706(2)(A), (C).  This violation of Section 111(d) is especially flagrant with respect to the States' express statutory authority under Section 111(d) to impose a less stringent standard of performance on an existing source after considering a facility's "remaining useful life" and "other factors."  42 U.S.C. § 7411(d)(1).

Under Section 111(d), as explained above, EPA's role in regulating existing methane-emitting sources is limited only to identifying "the best system of emission reduction" for those sources and the "degree of emission limitation achievable through application of" that system.  *Id.* § 7411(a)(1).  EPA must then approve *any* state plan that achieves either that level of emission reductions or a lesser amount if the State reasonably concludes that such lesser amount is justified after considering a facility's "remaining useful life."  *Id.* § 7411(d)(1).  Yet, the Final Rule's presumptive standards purport to expand EPA's regulatory authority beyond this limited role, unlawfully exceeding EPA's narrow

statutory role for regulating existing sources set out by Congress in Section 111(d). *See id.*; *West Virginia*, 597 U.S. at 710.

Indeed, the Final Rule sets out both presumptive standards of performance and presumptive work practice standards that States must presumptively adopt in their Section 111(d) plans, 89 Fed. Reg. at 16,829, 16,833–35, 16,995, JA___, JA___–___, JA___, notwithstanding the States' express statutory authority to set their own standards of performance for existing sources under Section 111(d). As for the Final Rule's presumptive standards of performance—the majority of which simply mirror the Final Rule's standards of performance for new sources, *id.* at 16,830–35, JA___–___—they impose the most stringent possible emission limitations. So, for example, the Rule lists a zero-methane-emission standard as a "presumptive standard" for facilities with pumps powered by natural gas or natural-gas-driven process controllers. 89 Fed. Reg. at 16,833–35, JA___–___; *supra* pp.20–21. The Final Rule's presumptive work practice standards require States to impose expensive technological equipment, procedures, and updates on covered facilities. For example, the Final Rule's "presumptive standard" for certain smaller wells mandates quarterly monitoring requirements, with other larger

wells additionally having semiannual monitoring via more expensive optical gas imaging. 89 Fed. Reg. at 16,830–33, JA\_\_\_–\_\_\_; *supra* p.21. The Final Rule's "presumptive standards" for methane-producing wells prohibit almost all flaring of methane, permitting facilities to use flares or other control devices only if they achieve a 95 percent reduction in methane emissions. 89 Fed. Reg. at 16,889, JA\_\_\_; *supra* pp.21–22.

The Final Rule makes clear that States wishing to exercise their own Section 111(d) authority to set their own standards of performance first must rebut the presumptive standards, while States that simply adopt the presumptive standards presumptively satisfy the Final Rule. *See* 89 Fed. Reg. at 16,829, JA\_\_\_. The Final Rule explains that "components of a state plan that differ from any presumptively approvable aspects of the [emissions guidelines] . . . will be *thoroughly reviewed by the EPA.*" *Id.* at 17,006, JA\_\_\_ (emphasis added). The Final Rule states that, if States have "existing programs [that] they may want to leverage for purposes of satisfying their CAA section 111(d) state plan obligations" that differ from the "presumptive standards," those States must satisfy an arduous, multi-step process to have any chance of demonstrating to EPA that their preexisting state programs have

"equivalency . . . with the proposed presumptive standards." *Id.* at 16,996, JA___. And EPA candidly stated when proposing the rule that "it would likely be difficult for States to demonstrate that the presumptive standards are not reasonable for the vast majority of designated facilities." 86 Fed. Reg. at 63,251, JA___. This is an inversion of the federal-state structure created by Congress in Section 111(d), as it puts the States' power to set the standards of performance for existing sources in the first instance under the control of EPA.

This EPA-first approach is particularly problematic when it comes to the States' right to consider a facility's "remaining useful life" and "other factors." 42 U.S.C. § 7411(d)(1). The Final Rule explains that it is "extremely unlikely" that States could justify departing from the presumptive standards by adopting a lower standard for a given existing source "based on costs relative to remaining useful life." 89 Fed. Reg. at 17,004, JA___. And the Rule limits States to applying a less burdensome emission limitation on an existing facility in an exercise of their statutory rights to consider the remaining useful life of that facility only after they satisfy the specific, heightened requirements that the Rule lays out. *See id.* at 17,002–05, JA___–___ (incorporating 40 C.F.R.

§ 60.24a (subpart Ba)).  This extra-textual mandate shows that the Rule does not respect the States' express statutory role in making their own conclusions as to the "remaining useful life" and "other factors" important to their existing sources, without *any* textual limitations or heightened-showing requirements.  42 U.S.C. § 7411(d)(1)

Finally, EPA's repeated statements in the Final Rule regarding the presumptively controlling weight of the presumptive standards accords with the ordinary legal meaning of a "presumption."  A "presumption" establishes some "predicate fact" that "produces a required conclusion in the absence of explanation," such that the party against whom a presumption is directed has "the burden of producing an explanation to rebut" the presumption.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993) (citations omitted); *see also* Fed. R. Evid. 301; *accord Presumption*, Black's Law Dictionary (12th ed. 2024).  So, here, EPA presumes that the Final Rule's standards satisfy every State's obligation to set standards of performance for existing sources, while States that want to depart from those standards must rebut the presumption.  This is flatly contrary to Section 111(d)'s grant of authority to the States.

## II. The Rule's Two-Year Deadline For States To Submit Section 111(d) Plans Is Arbitrary And Capricious

A. The Administrative Procedure Act requires agencies to engage in "reasoned decisionmaking," *Fred Meyer Stores, Inc. v. Nat'l Lab. Rels. Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017); *Mingo Logan*, 829 F.3d at 718–19; *State Farm*, 463 U.S. at 43–44, 52, and thus prohibits agencies from taking any action that is "arbitrary [and] capricious," 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious when the agency fails to "reasonably consider[ ] the relevant issues." *Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous Materials Safety Admin.*, 114 F.4th 744, 749 (D.C. Cir. 2024) (citation omitted); *see also Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288–91 (D.C. Cir. 2023). This means that the agency may not fail to reasonably address "an important aspect of [a] problem.'" *Mingo Logan*, 829 F.3d at 718 (quoting *State Farm*, 463 U.S. at 43). An agency "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record, and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Cal. Pub. Utils. Comm'n v. Fed. Energy*

*Reg. Comm'n*, 20 F.4th 795, 800 (D.C. Cir. 2021) (citations omitted); *see also Window Covering Mfrs.*, 82 F.4th at 1288–89.

Further, and relatedly, an agency must provide "reasoned responses" to comments raising important concerns. *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1096 (D.C. Cir. 2007); *see also Window Covering Mfrs.*, 82 F.4th at 1290–91; *accord Ohio*, 603 U.S. at 293–94. This Court has expressly acknowledged its obligation to "overturn a[n] [EPA] rulemaking as arbitrary and capricious where the EPA has failed to respond to specific challenges that are sufficiently central to its decision." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992). And it has vacated a rule setting too short a "compliance deadline" where the agency failed to explain "why it chose to credit" one commenter's opinion over the proper length of the deadline over others, while also relying on "flawed" reasons for declining "to extend the compliance deadline." *Window Covering Mfrs.*, 82 F.4th at 1290–91 ("Under the circumstances, that decision was arbitrary.").

B. Here, the Final Rule's two-year deadline for States to submit their Section 111(d) plans violates the Administrative Procedure Act because EPA failed to explain how this deadline provides States with

sufficient time to develop their own standards of performance under Section 111(d), rather than simply adopt EPA's "presumptive standards." 89 Fed. Reg. at 17,010, JA___; *see* 5 U.S.C. § 706(2)(A). EPA received voluminous comments explaining in detail why a shortened timeline for developing and submitting state plans was infeasible, yet the agency failed to reasonably consider that problem or adequately respond to those significant concerns. EPA, Response to Comments on Proposed Rule and Supplemental Proposed Rule at I-19-50–61, Doc.EPA-HQ-OAR-2021-0317-4009 (Nov. 2023), JA___–___ ("EPA Response to Comments").

As State Petitioners explained to EPA in comments during the rulemaking process, many States need at least three years to prepare a state plan under Section 111(d), especially given that the Rule contemplates many States regulating for the first time *hundreds of thousands* of diverse oil-and-gas facilities. *See supra* pp.15–16. Specifically, because the Rule "includes thousands of additional sources for oil and gas states," this increase in regulated sources makes even the process of "gathering an inventory of [these] designated facilities" alone an overly time-consuming endeavor, as State Petitioners informed EPA. Okla. Sec'y Comment, *supra*, at 20, JA___; *see also id.* Att.B at 2, JA___.

These sources include, for example, well sites, centralized production facilities, and compressor stations, 89 Fed. Reg. at 16,871–73, 16,885–91 JA\_\_\_–\_\_\_, JA\_\_\_–\_\_\_, and they are located throughout the entire oil-and-gas supply chain—production, processing, transportation, and storage, *id*. at 16,881–84, JA\_\_\_–\_\_\_.

The "sheer number of new regulated entities" that the Final Rule requires States to regulate—and "the quantity of data" that complying with these new regulations will require—"would make it extraordinarily challenging for States to develop a plan" in any timeline shorter than three years. State Petitioners' Jan. 2022 Comment, *supra*, at 16, JA\_\_\_; *see also* State Petitioners' Feb. 2023 Comment, *supra*, at 6, JA\_\_\_ (discussing the "scale of the task that [EPA] has now thrust on the States"); *accord* Ark. Comment, *supra*, at 6, JA\_\_\_ ("[S]tates must have time to assess all affected sources in light of their remaining useful lives, and other factors."); Alaska Comment, *supra*, at 4–5, JA\_\_\_–\_\_\_ (discussing the "incredibly diverse [oil-and-gas] industry"). In addition, "[methane] is not a pollutant that has been previously regulated by [at least some States] and as such to collect an emission inventory, understand the monitoring and quantification of potential methane

emissions, determination of stakeholders to have meaningful engagement with, evaluation of equivalency of current standards . . . and understanding the impacts of compliance with the plan" necessitates at least a three-year deadline. Utah Comment, *supra*, at 5, JA___; *accord* Ark. Comment, *supra*, at 6, JA___; Wyo. Comment, *supra*, at 6–9, JA___–___.

Two years is simply not enough time for many States to exercise their statutory authority under Section 111(d) and design their own standards of performance, especially for those States that now must regulate hundreds of thousands of diverse sources in their oil-and-gas facilities for the first time. *See supra* pp.15–16. Rather, many States require three years to adopt standards of performance under Section 111(d) that, for example, "assess all affected sources in light of their remaining useful lives, and other factors," Ark. Comment, *supra*, at 6, JA___, rather than risk "submittal of an inadequately prepared plan that EPA would have to review and reject, leading to unnecessary use of already limited resources," Utah Comment, *supra*, at 5, JA___. The States' three-year-minimum timeline is more than reasonable, especially given the Rule's additional time-intensive requirements and failure to

account for the time needed for state-law-specific processes. *See supra* pp.22–24.

Nevertheless, EPA imposed its two-year deadline for the States to submit their Section 111(d) plans without providing any meaningful response to State Petitioners' concerns. 89 Fed. Reg. at 17,008–10, JA\_\_\_–\_\_\_. While EPA acknowledged that a "large number of state commenters in addition to other commenters" warned that the original 18-month submission deadline in the proposed rule was insufficient, the agency only addressed the States' argument that more time was needed for them to "complete state administrative processes, conduct public hearings, engage with pertinent stakeholders," and the like. *Id.* at 17,008–10, JA\_\_\_–\_\_\_. But those state-administrative-timing concerns are secondary to State Petitioners' fundamental concern: it will take three years for many States to design their *own* standards of performance as Section 111(d) contemplates, given that the Rule covers, for the first time, hundreds of thousands of diverse oil-and-gas facilities.

EPA further aggravated State Petitioners' timing concerns regarding the scope and diversity of covered oil-and-gas facilities by adding several more complexities to the States' already onerous obligations

as they develop their Section 111(d) plans, despite multiple comments opposing these additional hurdles. *See, e.g.,* Okla. Sec'y Comment, *supra*, Att.B at 4–5, JA___–___. For example, the Final Rule imposes heightened requirements for States' considering the remaining useful life of a facility, which will require States to perform highly technical analyses. 89 Fed. Reg. at 17,002–05, JA___–___; *accord supra* pp.22–23, 35–37. State regulators will also need to learn and adopt a new system of assessment, due to the Final Rule's shift in evaluating emissions from throughput to component parts. 89 Fed. Reg. at 17,011, JA___. And the Final Rule adopts more rigorous "meaningful engagement" requirements, *id.* at 17,006–07, JA___–___, while also requiring States to undertake a distinct (and substantial) regulatory effort to create new permitting requirements that meet the Final Rule's rewritten "legally and practicably enforceable" standard, *id.* at 16,978, JA___.

In all, the Final Rule's imposition of this two-year deadline upon the States while ignoring the "important . . . problem," *Mingo Logan*, 829 F.3d at 718 (quoting *State Farm*, 463 U.S. at 43), with this short compliance deadline that the States flagged renders the Final Rule arbitrary and capricious, *Window Covering Mfrs.*, 82 F.4th at 1290–91.

Many States here raised their important concerns to EPA in public comments, *see id.*, explaining that they needed three years to adopt Section 111(d) plans, especially given the Rule's inclusion of hundreds of thousands of new and diverse oil-and-gas facilities, *supra* pp.15–16. Yet EPA "did not explain why" it disagreed with State Petitioners on this score. *See Window Covering Mfrs.*, 82 F.4th at 1290–91; *supra* pp.23–24, 43. So, "[u]nder the circumstances, that decision was arbitrary." *Window Covering Mfrs.*, 82 F.4th at 1291; *supra* pp.39–40, 43.

## III. EPA Relies On An Inherently Flawed Cost-Benefit Analysis To Justify The Rule's Unreasonable And Unachievable Standards

A. "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015); *see Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002). "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan*, 576 U.S. at 753. "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682

F.3d 1032, 1040 (D.C. Cir. 2012); *see City of Portland v. EPA*, 507 F.3d 706, 712–13 (D.C. Cir. 2007) (noting that this Court "will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses"); *see also supra* pp.38–39.

As a result, EPA's consideration of costs in its rulemakings must also reflect reasoned decisionmaking. *Mingo Logan*, 829 F.3d at 718–19; *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040; *City of Portland*, 507 F.3d at 712–13. "One would not say that it is even rational . . . to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Michigan,* 576 U.S. at 752. So, while EPA may promulgate rules that "impose[ ] numerous and costly requirements" on regulated entities and States under the Clean Air Act, *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 322 (2014), the agency must first balance the projected costs associated with its desired regulations, including the costs of compliance, against the likely benefits before issuing a rulemaking, *Michigan*, 576 U.S. at 759; *see Nat'l Ass'n of Home Builders*, 682 F.3d at 1040.

Section 111 specifically contemplates such a cost-benefit analysis, as EPA must "tak[e] into account *the cost of achieving [emission]*

*reduction*," as well as "any nonair quality health and environmental impact and energy requirements" when determining "the best system of emission reduction" that can be "adequately demonstrated." 42 U.S.C. § 7411(a)(1) (emphasis added); *see West Virginia*, 597 U.S. at 708.

B. Here, EPA did not conduct a sufficiently reasoned evaluation of the costs and benefits of the Final Rule in three respects, each of which renders the Rule arbitrary and capricious. *Mingo Logan*, 829 F.3d at 718; *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040; *City of Portland*, 507 F.3d at 712–13.

*First*, EPA did not properly weigh the compliance costs for States, *Mingo Logan*, 829 F.3d at 718–19; *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040, despite receiving numerous comments urging it to do so, EPA Response to Comments, *supra*, at I-21-6–9, JA___–___; *see supra* p.16. In the Final Rule and supporting Regulatory Impact Analysis, EPA claimed to have weighed the total compliance costs of implementing the Rule nationwide against the benefits. 89 Fed. Reg. at 16,836 & tbl.6, JA___; EPA, Regulatory Impact Analysis for Final Rule at 1-9–15, Doc.EPA-HQ-OAR-2021-0317-4021 (Dec. 2023), JA___–___ ("EPA Regulatory Impact Analysis"). But this two-part analysis, which EPA describes as

"reflect[ing] a nationwide engineering analysis of compliance cost," 89 Fed. Reg. at 16,835, JA___; *see* EPA Regulatory Impact Analysis, *supra*, at 2-59–63, JA___–___, entirely omits the States' compliance costs.

Instead, EPA's analysis consists of just two components that focus solely on oil-and-gas facilities' potential compliance costs. The first looks at the "characteristics" of "a set of representative or model plants for each regulated facility, segment, and control option." 89 Fed. Reg. at 16,835, JA___; *see* EPA Regulatory Impact Analysis, *supra*, at 2-29–30, JA___–___. The "second component is a set of projections of activity data for affected facilities, distinguished by vintage, year, and other necessary attributes." 89 Fed. Reg. at 16,835, JA___; *see* EPA Regulatory Impact Analysis, *supra*, at 2-29–30, JA___–___. Neither component considers the important role of the States' in implementing EPA's Section 111 rulemakings or the compliance costs that States would necessarily incur under the Rule. *See* 89 Fed. Reg. at 16,835, JA___; *supra* pp.16, 45–47. And this was no *de minimis* mistake: costs to the States are estimated to tally into the hundreds of millions of dollars. *See, e.g.*, State Petitioners' Feb. 2023 Comment, *supra*, at 9–10, JA___–___. The omission of any

projections or consideration of the States' compliance costs alone renders the Rule arbitrary and capricious. *Mingo Logan*, 829 F.3d at 718–19.

*Second*, even if EPA had incorporated the compliance costs to the States into its cost analysis, *but see supra* pp.16, 47–48, its "nationwide engineering analysis of compliance cost" approach is insufficient, 89 Fed. Reg. at 16,835, JA___. As discussed above, the existing sources covered by the Final Rule are not evenly dispersed across the Nation. *See supra* pp.40–42. Certain States, including many State Petitioners, produce and process the majority of domestic oil and gas. U.S. Energy Info. Admin., *Rankings: Crude Oil Production* (Aug. 2024);[4] U.S. Energy Info. Admin., *Rankings: Natural Gas Marketed Production* (2023).[5] These States have thousands of oil-and-gas facilities affected by the Rule, while other States have relatively few. *Rankings: Crude Oil Production*, *supra*; *Rankings: Natural Gas Marketed Production*, *supra*; Wyo. Comment, *supra*, at 13, JA___. Most of the States with significant oil-and-gas-industry operations already extensively regulate the industry at the state level. For example, Wyoming's Air Quality Division's programs already cover

---

[4] Available at https://www.eia.gov/state/rankings/#/series/46.

[5] Available at https://www.eia.gov/state/rankings/#/series/47.

over 18,000 operating single well sites and compressor stations, Wyo. Comment, *supra*, at 13–15, JA___–___, while Oklahoma's Department of Environmental Quality already covers over 10,000 oil-and-gas facilities, Okla. Sec'y Comment, *supra*, Att.B at 1–2, JA___–___. The number of these sites alone is daunting, but the Final Rule's regulation of specific equipment such as pneumatic pumps and controllers would exponentially increase the number of sources these States must regulate. For example, in Oklahoma, the number of sources covered under the Rule exceeds 200,000. Okla. Sec'y Comment, *supra*, Att.B at 1–2, JA___–___. The States with more oil-and-gas facilities will be subject to much higher compliance costs and thus bear a disproportionate burden to implement the Rule.

EPA's failure to analyze the state-specific impacts of the Final Rule and the costs this imposes on States and their industries is arbitrary and capricious. *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040; *City of Portland*, 507 F.3d at 712–13. The disproportionally burdened States will not necessarily secure additional funding to offset the compliance costs imposed by the Rule, resulting in that burden being shifted, at least in part, to those States' citizens and industry members. Many State

Petitioners already support extensive compliance programs with state funding and industry operator fees. *See, e.g.*, Wyo. Comment, *supra*, at 13–15, JA___–___; Okla. Sec'y Comment, *supra*, Att.B at 1–2, JA___–___. For example, for over a decade, Wyoming's Air Quality Division has been almost entirely funded through operator-paid fees and the State's General Fund, with federal funding only providing about 7% of the total budget. Wyo. Comment, *supra*, at 13–14, JA___–___. In States with a significant oil-and-gas industry, like many State Petitioners, the Rule's costly compliance requirements will only increase the already substantial costs for state-level air-quality programs. For the Final Rule's cost-benefit analysis to survive arbitrary-and-capricious review, EPA needed to consider the uneven burden the Rule imposes on certain States and their industries and the outsized compliance costs that those States now face. *Mingo Logan*, 829 F.3d at 718.

*Finally*, EPA improperly relied on the "social cost" of greenhouse gas pollution, a fundamentally flawed metric, to justify the Final Rule's excessive regulation of methane emissions from oil-and-gas sources. EPA explains that it "estimated the monetized climate benefits of methane emission reductions expected from [the Final Rule] using estimates of the

social cost of methane [ ] that reflect recent advances in the scientific literature on climate change and its economic impacts." 89 Fed. Reg. at 16,835, JA___. EPA heavily relies on these "recent advances in the scientific literature" to support its claim that the benefits of reducing these "social costs" of methane balance out the Rule's substantial regulatory costs. *Id.* at 16,836 & tbl.6, JA___; EPA Regulatory Impact Analysis, *supra*, at 1-9–15, JA___–___. It cites certain recent articles and studies in claimed support of the agency's position. EPA, Oil and Natural Gas Environmental Research Publications, Doc.EPA-HQ-OAR-2021-0317-0100 (Nov. 2021), JA___; EPA, Supplementary Material for the Regulatory Impact Analysis for the Final Rulemaking: Report on the Social Cost of Greenhouse Gases, Doc.EPA-HQ-OAR-2021-0317-4007 (Nov. 2023), JA___ ("EPA Supplementary Social Cost Report"). But EPA failed to engage adequately with the scientific literature that explains that the social-cost metric cannot be reliably quantified, EPA Response to Comments, *supra*, at I-20-37–38, JA___–___, although commenters raised this contrary evidence to EPA during the rulemaking here, *see, e.g.*, Wyo. Comment, *supra*, at 12–13, JA___–___.

The "social cost of methane" is an inaccurate and unreliable metric that has long been subjected to scientific and public scrutiny. Wyo. Comment, *supra*, at 12–13, JA___–___; N.D. Comment, *supra*, at 7–11, JA___–___; State Petitioners' Feb. 2023 Comment, *supra*, at 10, JA___. EPA is a member of the controversial Interagency Working Group on the Social Cost of Greenhouse Gases, and the methodologies, values, and data it relied on for its social-cost calculations "have been consistent with those developed and recommended by the Interagency Working Group." EPA Supplementary Social Cost Report, *supra*, at 1–2, JA___–___; *see* Wyo. Comment, *supra*, at 12, JA___. Yet, powerful scientific authorities have repeatedly called into question the methodologies and metrics underlying the Final Rule's social cost calculations, including EPA's Integrated Assessment Models. Wyo. Comment, *supra*, at 12–13, JA___–___. For example, Massachusetts Institute of Technology economist Robert Pindyck identified "a major problem with [Integrated-Assessment-Model]-based climate policy analysis: The modeler has a great deal of freedom in choosing functional forms, parameter values, and other inputs, and different choices can give wildly different estimates of the [social cost of greenhouse gases] and the optimal amount of

abatement." Robert S. Pindyck, *Climate Change Policy: What do the Models Tell Us?* 5 (Nat'l Bureau of Econ. Rsch. Working Paper No.19244, 2013). As a result, "*an [Integrated-Assessment-Model]-based analysis suggests a level of knowledge and precision that is nonexistent, and allows the modeler to obtain almost any desired result because key inputs can be chosen arbitrarily.*" Wyo. Comment, *supra*, at 12–13, JA___–___ (quoting Pindyck, *supra*, at 16).

Other agencies have declined to adopt the flawed metrics that EPA utilizes in the Final Rule. *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 78–79 (D.D.C. 2019). For example, FERC has concluded that the Interagency Working Group's approach is "inadequately accurate to warrant inclusion," and instead utilized other metrics in its cost-benefit analyses. *EarthReports, Inc.*, 828 F.3d at 956. This Court has held that FERC's decision not to use the same metrics EPA relies on here was reasonable. *See, e.g., id.* (concluding FERC acted reasonably in finding the social cost of carbon tool "inadequately accurate to warrant inclusion"); *accord Ala. Mun. Distribs. Grp. v. FERC*, 100 F.4th 207, 214–

15 (D.C. Cir. 2024) (same); *Sierra Club v. FERC*, 672 F. App'x 38, 39 (D.C. Cir. 2016) (same).

Here, EPA has skewed its modeling by "placing disproportionate weight on future impacts of methane emissions, while devaluing the economic and social benefit created from present-day processes that emit greenhouse gases." Wyo. Comment, *supra*, at 12, JA___. Without EPA's addition of the flawed "social cost" metric in its cost-benefit analysis, it would be even more clear that the regulatory and compliance costs of implementing the Final Rule significantly outweigh any remaining concrete benefit. EPA's use of this unreliable metric to impermissibly amplify the benefits of the Final Rule while understating the Rule's impacts does not come close to the reasoned decisionmaking that the Administrative Procedure Act requires. *See Mingo Logan*, 829 F.3d at 718; *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040; *City of Portland*, 507 F.3d at 712–13.

## IV. The Super-Emitter Program Unlawfully Delegates EPA's Monitoring Authority To Third Parties

The Final Rule imposes a "Super-Emitter Program" whereby EPA will deputize third parties to identify methane-release events and notify EPA, not the States, to trigger enforcement. This Super-Emitter

Program is doubly flawed, as it exceeds EPA's statutory authority under the Clean Air Act, *infra* Part IV.A, and—if it were somehow statutorily authorized—causes grave concerns with the Constitution's separation-of-powers and nondelegation doctrines, *infra* Part IV.B.

## A.     The Super-Emitter Program Violates The Clean Air Act

The Final Rule's Super-Emitter Program exceeds EPA's authority under the Clean Air Act and upends the Act's cooperative-federalism balance.  42 U.S.C. § 7607(d)(9); 5 U.S.C. § 706(2)(A), (C); *see* 42 U.S.C. § 7414.  Moreover, by including the Super-Emitter Program in the Final Rule, EPA ignored voluminous comments that highlighted the significant problems that such a third-party monitoring program will create, *see Ohio*, 603 U.S. at 281, which also renders this aspect of the Rule arbitrary and capricious, *see supra* pp.38–39.

1. As an initial matter, the Clean Air Act does not authorize the Super-Emitter Program.  42 U.S.C. § 7414(a)–(b).  The Super-Emitter Program deputizes third parties to "identify" methane-release events such as methane leaks.  89 Fed. Reg. at 16,877, JA___.  But nothing in the Act contemplates such a federal/private-citizen enforcement scheme. Congress explicitly delegated authority to EPA to enforce the provisions

of Section 111. 42 U.S.C. § 7414(a). The only provision in the Act that allows EPA to delegate its enforcement authority to another entity specifies that EPA "may delegate to [the] State[s] any authority [it] has to carry out" the enforcement of the Clean Air Act—and *only* to the States. *Id.* § 7414(b). This understanding is consistent with "the statutory construction principle [of] *expressio unius est exclusio alterius,* that is, the 'mention of one thing implies the exclusion of another thing,'" which principle this Court has previously applied to conclude that a statute expressly delegating authority to one group precludes the delegation of that authority to others. *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (citation omitted) (holding that a statutory provision "authoriz[ing] delegations to Coast Guard officials" must be construed "to exclude delegations to non-Coast Guard officials").

Where Congress has defined an enforcement role for private citizens in the Clean Air Act, it has done so explicitly, and it has limited that role to citizen suits. 42 U.S.C. § 7604. The Clean Air Act's citizen suit provision authorizes "any person" to "commence a civil action on his own behalf" against anyone "who is alleged to have violated" the Clean Air Act, *id.* § 7604(a), unless EPA or a State has already commenced an

enforcement action to remedy the violation, *id.* § 7604(b). By contrast, nothing in the Clean Air Act defines a role for private citizens to investigate emission events and report them to EPA. Yet EPA purports to authorize exactly that in the Super-Emitter Program.

EPA does not identify any statutory source for its attempt to delegate this enforcement authority to third parties. *See* 89 Fed. Reg. at 16,876–81, JA___–___. Instead, EPA simply discusses its *own* authority to enforce Section 111 under the Clean Air Act, stating that the Super-Emitter Program "is based on the EPA's authority under CAA section 114(a) to require any person who owns or operates any emission source (except mobile sources) to provide information necessary for purposes of carrying out the CAA and its authority to regulate sources under CAA section 111." *Id.* at 16,877–79, JA___–___.

The Super-Emitter Program diminishes States' role in addressing leak events, *see id.* at 16,876–81, JA___–___, contrary to the Clean Air Act's cooperative-federalism structure, *supra* pp.8–9. Section 114 of the Clean Air Act expressly defines a role for the States in implementing and enforcing Section 111, allowing EPA to fully delegate its enforcement authority to any State that establishes "adequate" enforcement

procedures. 42 U.S.C. § 7414(b). Yet, the Final Rule *only* "provid[es] a mechanism for the EPA to [ ] notify owners and operators of such events for appropriate follow-up action." 89 Fed. Reg. at 16,877, JA___. Indeed, EPA entirely omits any role for state agencies and does not even require that third-party enforcement agents report leak events to the States. *See id.* at 16,876–81, JA___–___.

As a result, EPA has cut the States out of the process for dealing with super-emitter events altogether. *Id.* at 16,877, JA___. Before EPA promulgated the Final Rule and established the Super-Emitter Program, the States were notified when a large-emission event was detected within their borders. State Petitioners' Feb. 2023 Comment, *supra*, at 5, JA___. The affected State would then review and respond to the event accordingly. *Id.*, JA___. But the Final Rule discards that cooperative-federalism response system entirely, only requiring the "EPA-approved" third-party entities that identify methane leaks to notify owners and operators directly. 89 Fed. Reg. at 16,877, JA___. That notice then obligates the plant's operators to conduct a root-cause analysis, report the findings to EPA, and take corrective action. *Id.*, JA___. As a result, the States are effectively sidelined.

Multiple commenters, including many State Petitioners, alerted EPA to this fundamental problem and other significant issues with the Super-Emitter Program. State Petitioners' Feb. 2023 Comment, *supra*, at 5, 8–9, JA___, JA___–___; Ark. Comment, *supra*, at 6–7, JA___–___; Alaska Comment, *supra*, at 2–3, JA___–___; Wyo. Comment, *supra*, at 9–11, JA___–___; Okla. Sec'y Comment, *supra*, at 11–13, 15–16, JA___–___, JA___–___; Utah Comment, *supra*, at 5–6, JA___–___. Several comments also included thoughtful modifications and additions to the Program that would have included the States in the methane-leak detection and reporting process. *See, e.g.*, Okla. Sec'y Comment, *supra*, at 11–13, JA___–___; Alaska Comment, *supra*, at 3, JA___; Utah Comment, *supra*, at 5, JA___. However, EPA provided no meaningful response to these commenters' significant concerns, instead simply acknowledging the concerns and directing commenters to the description of the Super-Emitter Program in its supplemental proposed rule. EPA Response to Comments, *supra*, at I-7-210–18, JA___–___ (citing 87 Fed. Reg. 74,702, JA___).

2. The practical problems created by the Super-Emitter Program underscore its unlawfulness. Multiple States are currently responsible

for monitoring and addressing leak events within their borders and have developed comprehensive reporting and monitoring systems for this purpose. *See, e.g.*, Ark. Comment, *supra*, at 7, JA___ (citing Ark. Code Ann. § 8-4-311); Okla. Sec'y Comment, *supra*, at 13, JA___ (referencing Okla. Stat. tit. 27A, § 1-1-203(B)); Wyo. Comment, *supra*, at 9, JA___ (citing Wyo. Stat. Ann. §§ 35-11-101 *et seq.*). As applied to the current regulatory landscape, the Super-Emitter Program will necessarily cause confusion among authorities and conflicts of law. The States' environmental and air control agencies—those with the legal authority to permit emissions activities, inspect facilities, and enforce compliance— would be further burdened by the untangling of the Final Rule's Super-Emitter Program from the current, well-established state-federal regulatory landscape.

The Super-Emitter Program also raises significant safety concerns that EPA failed to consider. *See* State Petitioners' Feb. 2023 Comment, *supra*, at 8–9, JA___–___. EPA's "approved" third-party enforcement agents, who are newly deputized to police oil-and-gas facilities, may be encouraged to trespass on private property to monitor and measure for super-emitting events. Moreover, the oil-and-gas facilities that the Final

Rule encourages these third parties to intrude upon carry out sensitive operations conducted with sophisticated, expensive technology and involving inherently dangerous conditions.  Yet the Rule's qualifications for the Program's third-party enforcement agents are considerably less stringent than its Appendix K requirements for compliance staff at state agencies and oil-and-gas facilities.  *Compare* 89 Fed. Reg. at 16,879, JA___, *with* 40 C.F.R. pt. 60, app.K; *see* Wyo. Comment, *supra*, at 11, JA___.  Thus, the Final Rule threatens to cause significant harm and damage both to oil-and-gas operators and owners and to the third-party agents themselves, which in turn could expose operators and owners to significant liability.

### B.    EPA's Attempted Delegation Of Authority To Third Parties Poses Grave Constitutional Problems

1. Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. art. I, § 1, and "[a]ccompanying that assignment of power to Congress is a bar on its further delegation," *Gundy v. United States*, 588 U.S. 128, 135 (2019).  As a result, "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested," *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S.

495, 529–30 (1935), although it may "'obtain[ ] the assistance of its coordinate Branches'—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws," *Gundy*, 588 U.S. at 135 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). However, "when Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409 (1928)).

The Constitution's separation-of-powers and underlying nondelegation principles prevent government actors from "wield[ing] power without owning up to the consequences." *Dep't of Transp. v. Ass'n of Am. R.Rs. (Amtrak)*, 575 U.S. 43, 57 (2015) (Alito, J., concurring). The Supreme Court has long considered "power conferred" on one private entity to regulate another to be "delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). "Just as it is a central tenet of liberty that the government may not permit a private person to take property from another private person, or allow private individuals

to regulate other private individuals, it follows that the government may not empower a private entity to exercise unchecked legislative or executive power." *Oklahoma v. United States*, 62 F.4th 221, 228–29 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2679 (2024) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388–89 (1798) (Chase, J.); *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 122 (1928)).

Even if Congress could delegate some authority to private parties, *see A.L.A. Schechter Poultry Corp.*, 295 U.S. at 537, agencies plainly cannot. "[W]hen an agency delegates power to outside parties, lines of accountability may blur, undermining an important democratic check on government." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565–66 (D.C. Cir. 2004). This Court has held that private entities may not wield equal power with a federal agency. *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 671–73 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43 (2015); *accord U.S. Telecom Ass'n*, 359 F.3d at 565–66. At a minimum, an agency's unchecked delegation of its own delegated power to private entities violates the nondelegation doctrine and implicates core separation-of-powers guarantees. *See Whitman*, 531 U.S. at 472; *J.W. Hampton, Jr., & Co.,* 276 U.S. at 409; *A.L.A. Schechter*

*Poultry Corp.*, 295 U.S. at 528–29; *see also Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, No. 23-5129, 2024 WL 4863140, at *1, *7–9 (D.C. Cir. Nov. 22, 2024) (holding, at the preliminary injunction stage, that the plaintiff will likely prevail on its argument that the Securities and Exchange Commission's unchecked delegation of expulsion authority to the Financial Industry Regulatory Authority "violates the private nondelegation doctrine").

2. Here, the Final Rule's Super-Emitter Program implicates grave nondelegation and separation-of-powers concerns. *Whitman*, 531 U.S. at 472; *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409; *A.L.A. Schechter Poultry Corp.*, 295 U.S. at 528–29. As discussed above, *supra* pp.63–64, EPA cannot lawfully delegate its authority to private entities without authorization from Congress, and the Clean Air Act only authorizes EPA to delegate its investigatory enforcement authority to the States, 42 U.S.C. § 7414(b). While Congress can delegate certain authority to private citizens—as it did with the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604—EPA cannot. The Court has previously explained the rationale underlying this important guardrail on agency authority, noting that "when an agency delegates power to outside parties, lines of

accountability may blur, undermining an important democratic check on government." *U.S. Telecom Ass'n*, 359 F.3d at 565–66. EPA cannot rewrite the statutory text to accommodate the Super-Emitter Program. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 75 (D.C. Cir. 2019) ("[A]n agency may not confer power on itself." (citation omitted)). Without "an intelligible principle" from Congress authorizing and guiding EPA's implementation of the Super-Emitter Program, such regulatory scheme is unlawful. *Whitman*, 531 U.S. at 472; *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409.

And even if the Clean Air Act explicitly contemplated the Program, which it does not, *supra* pp.56–59, Congress could not lawfully empower EPA to give such authority to private citizens. *See Carter Coal Co.*, 298 U.S. at 311; *see also Alpine Sec. Corp.*, 2024 WL 4863140, at *1, *7–9. Allowing EPA to deputize scores of unvetted private citizens that meet the Rule's minimum qualifications to perform the agency's own investigatory duties—creating a federally sanctioned environmental posse comitatus, in essence—would offend not only the Constitution's horizontal separation of powers but also the balance of power between the States and the federal government. There "is not even a fig leaf of

constitutional justification" for such delegation to private entities. *Amtrak*, 575 U.S. at 62 (Alito, J., concurring); *see also, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 700–01 (2015) (Roberts, C.J., dissenting) ("It is a fundamental principle that no branch of government can delegate its constitutional functions to an actor who lacks authority to exercise those functions."); *accord Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 440 (5th Cir. 2024) ("The government cannot delegate core governmental powers to unsupervised private parties.").

## CONCLUSION

The Court should vacate the Section 111(d) and Super-Emitter Program portions of the Final Rule and remand to EPA for further consideration consistent with the Court's decision.

Dated: November 25, 2024

Respectfully Submitted,

/s/ Misha Tseytlin

GENTNER DRUMMOND
*Attorney General*

GARRY M. GASKINS, II
*Solicitor General*

JENNIFER L. LEWIS
*Deputy Attorney General*
OFFICE OF THE ATTORNEY
GENERAL OF OKLAHOMA
313 NE Twenty-First St.
Oklahoma City, OK 73105
(908) 938-3712
garry.gaskins@aog.ok.gov
jennifer.lewis@aog.ok.gov

CARROLL WADE MCGUFFEY III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Ste. 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

JEFF P. JOHNSON
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point, Ste. 1500
Richmond, VA 23219
(804) 697-1480
jeff.johnson@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
KAITLIN L. O'DONNELL
EMILY A. O'BRIEN
DYLAN DEWITT
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

*Counsel for the State of Oklahoma*
*(Additional counsel listed on following pages)*

STEVE MARSHALL
*Attorney General*

EDMUND G. LACOUR JR.
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
Edmund.LaCour@
AlabamaAG.gov

*Counsel for the State of Alabama*


TREG TAYLOR
*Attorney General*

GARRISON TODD
*Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5539
Garrison.todd@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
*Attorney General*

NICHOLAS J. BRONNI
*Solicitor General*

DYLAN JACOBS
*Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for the State of Arkansas*

ASHLEY MOODY
*Attorney General*

HENRY C. WHITAKER
*Solicitor General*

JAMES H. PERCIVAL
*Chief of Staff*
OFFICE OF THE ATTORNEY
GENERAL OF FLORIDA
The Capitol, Pl-01
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@
myfloridalegal.com
james.percival@
myfloridalegal.com

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
*Attorney General*

STEPHEN J. PETRANY
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF GEORGIA
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

THEODORE E. ROKITA
*Attorney General*

JAMES A. BARTA
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF INDIANA
302 W. WASHINGTON ST.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

RAÚL R. LABRADOR
*Attorney General*

ALAN M. HURST
*Solicitor General*
OFFICE OF THE IDAHO ATTORNEY
GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 947-8773
alan.hurst@ag.idaho.gov

*Counsel for the State of Idaho*

BRENNA BIRD
*Attorney General*

ERIC H. WESSAN
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF IOWA
1305 E. Walnut Street
Des Moines, IA 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

KRIS KOBACH
*Attorney General*

ANTHONY J. POWELL
*Solicitor General*
KANSAS ATTORNEY GENERAL'S
OFFICE
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 368-8539
anthony.powell@ag.ks.gov

*Counsel for the State of Kansas*

RUSSELL COLEMAN
*Attorney General*

MATTHEW F. KUHN
*Solicitor General*
OFFICE OF THE KENTUCKY
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5447
matt.kuhn@ky.gov

*Counsel for the Commonwealth of
Kentucky*

LIZ MURRILL
*Attorney General*

J. BENJAMIN AGUIÑAGA
*Solicitor General*
LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 506-3746
aguinagaj@ag.louisiana.gov

*Counsel for the State of Louisiana*

LYNN FITCH
*Attorney General*

JUSTIN L. MATHENY
*Deputy Solicitor General*
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
601-359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW BAILEY
*Attorney General*

JOSHUA M. DIVINE
*Solicitor General*

SAMUEL C. FREEDLUND
*Deputy Solicitor General*
MISSOURI ATTORNEY GENERAL'S
OFFICE
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
josh.divine@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
*Attorney General*

CHRISTIAN B. CORRIGAN
*Solicitor General*
MONTANA DEPARTMENT OF
JUSTICE
215 North Sanders P.O. Box
201401 Helena, MT 59620
(406) 444-2707
christian.corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
*Attorney General*

ERIC J. HAMILTON
*Solicitor General*

GRANT STROBL
*Assistant Solicitor General*
NEBRASKA DEPARTMENT OF
JUSTICE
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.strobl@nebraska.gov

*Counsel for the State of Nebraska*

DREW H. WRIGLEY
*Attorney General*

PHILIP AXT
*Solicitor General*
OFFICE OF ATTORNEY GENERAL OF
NORTH DAKOTA
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

DAVID YOST
*Attorney General*

T. ELLIOT GAISER
*Solicitor General*

MATHURA J. SRIDHARAN
*Deputy Solicitor General*
OHIO ATTORNEY GENERAL'S OFFICE
30 E. Broad Street
Columbus, OH 43215
(614) 466-8980
thomas.gaiser@ohiogo.gov
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

ALAN WILSON
*Attorney General*

ROBERT D. COOK
*Solicitor General*

J. EMORY SMITH, JR.
*Deputy Solicitor General*

JOSEPH D. SPATE
*Assistant Deputy Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF SOUTH CAROLINA
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South
Carolina*

JONATHAN SKRMETTI
*Attorney General &
Reporter*

STEVEN J. GRIFFIN
*Senior Counsel for Strategic
Litigation & Assistant
Solicitor General*
TENNESSEE ATTORNEY GENERAL'S
OFFICE
P.O. BOX 20207
Nashville, TN 37202
(615) 741-3491
steven.griffin@ag.tn.gov

*Counsel for the State of Tennessee*

KEN PAXTON
*Attorney General of Texas*

BRENT WEBSTER
*First Assistant Attorney General*

JAMES LLOYD
*Deputy Attorney General for Civil Litigation*

KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection Division*

JOHN R. HULME
*Assistant Attorney General*

WESLEY S. WILLIAMS
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, MC-066
Austin, TX 78711
(512) 463-2012
john.hulme@oag.texas.gov
wesley.williams@oag.texas.gov

*Counsel for the State of Texas*

SEAN D. REYES
*Attorney General*

STANFORD E. PURSER
*Solicitor General*
UTAH ATTORNEY GENERAL'S OFFICE
160 East 300 South, 5th Floor
Salt Lake City, UT 84114
(385) 382-4334
spurser@agutah.gov

*Counsel for the State of Utah*

JASON MIYARES
*Attorney General*

KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
VIRGINIA ATTORNEY GENERAL'S OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

PATRICK MORRISEY
*Attorney General*

MICHAEL R. WILLIAMS
*Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

BRIDGET HILL
*Attorney General*

D. DAVID DEWALD
*Deputy Attorney General*
OFFICE OF THE ATTORNEY
GENERAL OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-6946
david.dewald@wyo.gov

*Counsel for the State of Wyoming*

Arizona Legislature

Warren Petersen
*President Of The Arizona
State Senate*

*By Counsel*:
Brunn (Beau) W. Roysden III
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

*Counsel for President of the
Arizona State Senate Warren
Petersen*

Ben Toma
*Speaker Of The Arizona
House Of Representatives*

*By Counsel*:
Brunn (Beau) W. Roysden III
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

*Counsel for Speaker of the
Arizona
House of Representatives Ben
Toma*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's September 4, 2024, Order because this brief contains 12,815 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2023 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: November 25, 2024

/s/ Misha Tseytlin
MISHA TSEYTLIN
*Counsel of Record*
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

# ADDENDUM OF STATUTES AND REGULATIONS

# TABLE OF CONTENTS FOR ADDENDUM
## OF STATUTES AND REGULATIONS

**Statutes**

42 U.S.C. § 7411 ................................................................. A-1

42 U.S.C. § 7414 ................................................................. A-7

42 U.S.C. § 7604 ................................................................. A-11

## 42 U.S.C. § 7411, Clean Air Act Section 111

§ 7411. Standards of performance for new stationary sources

## (a) Definitions

For purposes of this section:

**(1)** The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

**(2)** The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

**(3)** The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

**(4)** The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

**(5)** The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(6)** The term "existing source" means any stationary source other than a new source.

**(7)** The term "technological system of continuous emission reduction" means—

**(A)** a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

**(B)** a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

**(8)** A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 or any amendment thereto, or any subsequent enactment which supersedes such Act, or (B) which qualifies under section 7413(d)(5)(A)(ii) of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

**(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards**

**(1)**

**(A)** The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

**(B)** Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon

promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

**(2)** The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

**(3)** The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

**(4)** The provisions of this section shall apply to any new source owned or operated by the United States.

**(5)** Except as otherwise authorized under subsection (h), nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

**(6)** The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii) shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

***

## (d) Standards of performance for existing sources; remaining useful life of source

**(1)** The Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or

emitted from a source category which is regulated under section 7412 of this title but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.

**(2)** The Administrator shall have the same authority—

    **(A)** to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title in the case of failure to submit an implementation plan, and

    **(B)** to enforce the provisions of such plan in cases where the State fails to enforce them as he would have under sections 7413 and 7414 of this title with respect to an implementation plan.

    In promulgating a standard of performance under a plan prescribed under this paragraph, the Administrator shall take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies.

***

## (g) Revision of regulations

**(1)** Upon application by the Governor of a State showing that the Administrator has failed to specify in regulations under subsection (f)(1) any category of major stationary sources required to be specified under such regulations, the Administrator shall revise such regulations to specify any such category.

**(2)** Upon application of the Governor of a State, showing that any category of stationary sources which is not included in the list under subsection (b)(1)(A) contributes significantly to air pollution which may reasonably be anticipated to endanger public health or welfare (notwithstanding that such category is not a category of major stationary sources), the Administrator shall revise such regulations to specify such category of stationary sources.

**(3)** Upon application of the Governor of a State showing that the Administrator has failed to apply properly the criteria required to be considered under subsection (f)(2), the Administrator shall revise the list under subsection (b)(1)(A) to apply properly such criteria.

**(4)** Upon application of the Governor of a State showing that—

    **(A)** a new, innovative, or improved technology or process which achieves greater continuous emission reduction has been adequately demonstrated for any category of stationary sources, and

    **(B)** as a result of such technology or process, the new source standard of performance in effect under this section for such category no longer reflects the greatest degree of emission limitation achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) has been adequately demonstrated,

    the Administrator shall revise such standard of performance for such category accordingly.

**(5)** Unless later deadlines for action of the Administrator are otherwise prescribed under this section, the Administrator shall, not later than three months following the date of receipt of any application by a Governor of a State, either—

    **(A)** find that such application does not contain the requisite showing and deny such application, or

    **(B)** grant such application and take the action required under this subsection.

**(6)** Before taking any action required by subsection (f) or by this subsection, the Administrator shall provide notice and opportunity for public hearing.

## (h) Design, equipment, work practice, or operational standard; alternative emission limitation

**(1)** For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce a standard of performance, he may instead promulgate a design, equipment, work practice, or

operational standard, or combination thereof, which reflects the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. In the event the Administrator promulgates a design or equipment standard under this subsection, he shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2)** For the purpose of this subsection, the phrase "not feasible to prescribe or enforce a standard of performance" means any situation in which the Administrator determines that (A) a pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations.

**(3)** If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4)** Any standard promulgated under paragraph (1) shall be promulgated in terms of standard of performance whenever it becomes feasible to promulgate and enforce such standard in such terms.

**(5)** Any design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as a standard of performance for purposes of the provisions of this chapter (other than the provisions of subsection (a) and this subsection).

\*\*\*

# 42 U.S.C. § 7414, Clean Air Act Section 114

§ 7414. Recordkeeping, inspections, monitoring, and entry

## (a) Authority of Administrator or authorized representative

For the purpose (i) of developing or assisting in the development of any implementation plan under section 7410 or section 7411(d) of this title, any standard of performance under section 7411 of this title, any emission standard under section 7412 of this title,[ ] or any regulation of solid waste combustion under section 7429 of this title, or any regulation under section 7429 of this title (relating to solid waste combustion), (ii) of determining whether any person is in violation of any such standard or any requirement of such a plan, or (iii) carrying out any provision of this chapter (except a provision of subchapter II with respect to a manufacturer of new motor vehicles or new motor vehicle engines)—

**(1)** the Administrator may require any person who owns or operates any emission source, who manufactures emission control equipment or process equipment, who the Administrator believes may have information necessary for the purposes set forth in this subsection, or who is subject to any requirement of this chapter (other than a manufacturer subject to the provisions of section 7525(c) or 7542 of this title with respect to a provision of subchapter II) on a one-time, periodic or continuous basis to—

**(A)** establish and maintain such records;

**(B)** make such reports;

**(C)** install, use, and maintain such monitoring equipment, and use such audit procedures, or methods;

**(D)** sample such emissions (in accordance with such procedures or methods, at such locations, at such intervals, during such periods and in such manner as the Administrator shall prescribe);

**(E)** keep records on control equipment parameters, production variables or other indirect data when direct monitoring of emissions is impractical;

**(F)** submit compliance certifications in accordance with subsection (a)(3); and

**(G)** provide such other information as the Administrator may reasonably require; and

**(2)** the Administrator or his authorized representative, upon presentation of his credentials—

**(A)** shall have a right of entry to, upon, or through any premises of such person or in which any records required to be maintained under paragraph (1) of this section are located, and

**(B)** may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1), and sample any emissions which such person is required to sample under paragraph (1).

**(3)** The Administrator shall in the case of any person which is the owner or operator of a major stationary source, and may, in the case of any other person, require enhanced monitoring and submission of compliance certifications. Compliance certifications shall include (A) identification of the applicable requirement that is the basis of the certification, (B) the method used for determining the compliance status of the source, (C) the compliance status, (D) whether compliance is continuous or intermittent, (E) such other facts as the Administrator may require. Compliance certifications and monitoring data shall be subject to subsection (c) of this section. Submission of a compliance certification shall in no way limit the Administrator's authorities to investigate or otherwise implement this chapter. The Administrator shall promulgate rules to provide guidance and to implement this paragraph within 2 years after November 15, 1990.

## (b) State enforcement

**(1)** Each State may develop and submit to the Administrator a procedure for carrying out this section in such State. If the Administrator finds the State procedure is adequate, he may delegate to such State any authority he has to carry out this section.

**(2)** Nothing in this subsection shall prohibit the Administrator from carrying out this section in a State.

**(c) Availability of records, reports, and information to public; disclosure of trade secrets**

Any records, reports or information obtained under subsection (a) shall be available to the public, except that upon a showing satisfactory to the Administrator by any person that records, reports, or information, or particular part thereof, (other than emission data) to which the Administrator has access under this section if made public, would divulge methods or processes entitled to protection as trade secrets of such person, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such record, report, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter or when relevant in any proceeding under this chapter.

**(d) Notice of proposed entry, inspection, or monitoring**

**(1)** In the case of any emission standard or limitation or other requirement which is adopted by a State, as part of an applicable implementation plan or as part of an order under section 7413(d) of this title, before carrying out an entry, inspection, or monitoring under paragraph (2) of subsection (a) with respect to such standard, limitation, or other requirement, the Administrator (or his representatives) shall provide the State air pollution control agency with reasonable prior notice of such action, indicating the purpose of such action. No State agency which receives notice under this paragraph of an action proposed to be taken may use the information contained in the notice to inform the person whose property is proposed to be affected of the proposed action. If the Administrator has reasonable basis for believing that a State agency is so using or will so use such information, notice to the agency under this paragraph is not required until such time as the Administrator determines the agency will no longer so use information contained in a notice under this paragraph. Nothing in this section shall be construed to require notification to any State agency of any action taken by the Administrator with respect to any standard, limitation, or other requirement which is not part of an applicable implementation plan or which was promulgated by the Administrator under section 7410(c) of this title.

**(2)** Nothing in paragraph (1) shall be construed to provide that any failure of the Administrator to comply with the requirements of such paragraph shall be a defense in any enforcement action brought by the Administrator or shall make inadmissible as evidence in any such action any information or material obtained notwithstanding such failure to comply with such requirements.

## 42 U.S.C. § 7604, Clean Air Act Section 304

§ 7604. Citizen suits

### (a) Authority to bring civil action; jurisdiction

Except as provided in subsection (b), any person may commence a civil action on his own behalf—

**(1)** against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

**(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

**(3)** against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air quality) or part D of subchapter I (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)).  The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title.  In any such action for unreasonable delay,

notice to the entities referred to in subsection (b)(1)(A) shall be provided 180 days before commencing such action.

**(b) Notice**

No action may be commenced—

**(1)** under subsection (a)(1)—

**(A)** prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

**(B)** if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.

**(2)** under subsection (a)(2) prior to 60 days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of section 7412(i)(3)(A) or (f)(4) of this title or an order issued by the Administrator pursuant to section 7413(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

**\*\*\***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2024, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: November 25, 2024

/s/ Misha Tseytlin
MISHA TSEYTLIN
*Counsel of Record*
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com